UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN MICHAEL VAN BUITEN and IRON WORKERS MID-SOUTH PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | § § § § § § | Case No.: |
| | § § | CLASS ACTION |
| Plaintiffs, | § § | |
| v. | § § | |
| DELL INC., MICHAEL S. DELL, ALEX J. MANDL, DONALD J. CARTY, KLAUS S. LUFT, WILLIAM H. GRAY, III, JAMES W. BREYER, SHANTANU NARAYEN, H. ROSS PEROT, JR., GERARD J. KLEISTERLEE, JANET F. CLARK, LAURA CONIGLIARO, KENNETH M. DUBERSTEIN, SILVER LAKE PARTNERS, L.P., DENALI HOLDING INC., DENALI INTERMEDIATE INC., and DENALI ACQUIROR INC., | § § § § § § § § § § § § § § | |
| Defendants. | § § § | |

**COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATION OF FEDERAL SECURITIES LAWS**

## SUMMARY OF THE ACTION

1.     Plaintiffs John Michael Van Buiten and Iron Workers Mid-South Pension Fund, by and through their undersigned counsel, in their individual capacities, and on behalf of all other similarly situated shareholders of Dell Inc. ("Dell" or the "Company"), bring the following Complaint for Breach of Fiduciary Duties and Violations of Federal Securities Laws against Dell, members of Dell's Board of Directors (the "Board" or "Individual Defendants"), Silver Lake Partners, L.P. ("Silver Lake"), Denali Holding Inc. ("Denali Holding"), Denali Intermediate Inc. ("Denali Intermediate"), and Denali Acquiror Inc. ("Merger Sub"), arising out of their breaches of fiduciary duties and/or other violations of state law, and/or aiding and abetting thereof, in connection with the attempt of defendant Michael S. Dell ("M. Dell"), the founder, Chairman of the Board, and Chief Executive Officer ("CEO") of Dell, Silver Lake, Denali Holding, Denali Intermediate, and Merger Sub to purchase Dell for inadequate consideration of $13.65 for each share of Dell's common stock (the "Proposed Acquisition").   The Proposed Acquisition is expected to close during the second quarter of fiscal year 2013 (which ends on August 2, 2013).  Plaintiffs make the following allegations upon knowledge as to plaintiffs and upon information and belief (including investigation of counsel and review of publicly available information) as to all other matters, and allege as follows.

2.     This is a stockholder class action brought by plaintiffs on behalf of holders of common stock of Dell against Dell, certain Dell officers and directors, Silver Lake, Denali Holding, Denali Intermediate, and Merger Sub.  This matter arises out of defendants' dissemination of a false and misleading Proxy Statement (the "Proxy") in violation of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 of the U.S. Securities and Exchange Commission ("SEC") promulgated thereunder, and the Board's breaches of its fiduciary duties owed to the Company's shareholders under state law.

3.     In pursuing the unlawful plan to induce Dell's shareholders to approve the Proposed Acquisition via an unfair and uninformed process, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, diligence, independence, good faith, and fair dealing.  In particular, the Individual Defendants have engaged in actions intended to benefit an insider at the expense of the Company's public shareholders.

4.     After his failed management choices led to significant losses for Dell and a resulting decrease in the Company's stock price, defendant M. Dell is now attempting to take advantage of the Company's distressed stock price to buy the Company on the cheap just as it is starting to experience a turnaround.  The Company has implemented dramatic measures to build long-term growth and transform itself from a personal computer ("PC") company to a services firm focusing on end-to-end information technology (IT) solutions for small and medium-sized businesses.  This transformation has been supported by more than $13 billion in acquisitions since 2008.  According to defendant M. Dell, these acquisitions "add[] leading management, security, virtualization and cloud capabilities to [Dell's] expanding portfolio of powerful solutions."  This expansion-based strategy has not only set the foundation for Dell's long-term growth, but has also started to benefit the Company in the short-term.  For instance, based on the Company's results for the most recent fiscal quarter, Dell's Enterprise Solutions Group revenue grew 10% year-over-year and its operating income increased 71% year-over-year.  With recent efforts to turn around the troubled Company showing signs of success, the timing of defendant M. Dell's Proposed Acquisition is inopportune, inappropriate, and unfair to the Company's shareholders.

5.      The Proposed Acquisition is also unfair and inadequate because the intrinsic value of the Company is materially in excess of the $13.65 offer price (the "Proposed Consideration"). The inadequacy of the Proposed Consideration is demonstrated by the fact that: (i) the purported 25% premium offered by the Proposed Consideration actually represents a 27% discount as compared to the price Dell's stock traded as recently as last year; (ii) the Company's current depressed stock price appears to be the result of recent earnings misses and is not a reflection of the Company's true value; (iii) there are at least nine analysts that have price targets for the Company above the Proposed Consideration price of $13.65 per share, with certain analysts' targets ranging as high as $18 per share; (iv) as explained in more detail herein, by numerous commonly employed valuation metrics, the implied consideration is particularly inadequate when compared to the value of other similarly sized companies in the same market as Dell; and (v) the Company's largest outside investors, including Southeastern Asset Management, Inc. ("Southeastern"), Icahn Enterprises L.P. ("Icahn Enterprises"), and T. Rowe Price Associates ("T. Rowe") (which collectively own nearly 20% of the Company's shares), vehemently oppose the buyout proposal, maintaining that the true value of the Company that shareholders should receive is as high as $24 a share and have proposed alternative transactions that offer substantially more value for the shareholders.

6.      The Company's own management and advisers have confirmed that even if Dell is only able to partially implement its stand-alone strategic objectives, it would still be worth more than the Proposed Consideration.   In fact, based on management's internal estimates, the Company is worth between $15.50 and $21.75.  Refusing to believe the management it installed, the Board hired a third-party consulting firm, The Boston Consulting Group, Inc. ("BCG"), to provide its own estimates.  Based on BCG's estimates, if the Company is able to achieve even

75% of its restructuring goals, the Company's implied value per share is $15 to $21.25, nearly in line with management's estimates.

7.     The Board knows the Company is undervalued.  In fact, at one point, the Special Committee attempted to shut down the sale process after Silver Lake made a woefully undervalued bid for Dell.  However, when the Special Committee tried to inform defendant M. Dell of this decision, he made it clear that his preference was to run the Company privately, and the Special Committee caved in to his demands without running any semblance of a competitive sales process or seriously exploring alternative transactions before agreeing to the Proposed Acquisition.  That the Board believes the Company is worth more than the Proposed Consideration is further demonstrated by the fact that over the last two years, the Board has engaged in an aggressive stock buyback program in which it acquired Dell stock at an average price of $15.25 per share.

8.     Defendant M. Dell has repeatedly and publicly justified taking the Company private on the purported ground that he can successfully restore the Company to its former height only as a private company.  However, defendant M. Dell's asserted rationale for the Proposed Acquisition is belied by the analyses of Dell's own executives and advisors.  For example, in a recent interview, John A. Swainson, President of Dell's software unit, stated that Dell's financial success is not tied in any way to whether it is a public or private company.  In addition, BCG, an advisor to the Special Committee, stated that Dell could achieve its restructuring plan as either a private or public company.

9.     The Special Committee ran a completely flawed and inadequate pre-signing sales process, in which it limited potential buyers to a select number of private equity firms (mainly defendant Silver Lake and K.K.R. & Co., L.P. ("K.K.R.")) that would permit defendant M. Dell

to gain a controlling stake in the Company and remain as CEO.  The prevailing bidder, defendant Silver Lake, was defendant M. Dell's favored bidder from the start because of his longtime relationship with the private equity firm.   The Special Committee knew that Blackstone Management Partners L.L.C. ("Blackstone") had expressed an interest in making a bid for the Company and that Dell's largest outside shareholder, Southeastern, was interested in being involved in any going-private transaction.  The Special Committee, however, did not solicit any alternative bids before agreeing to the Agreement and Plan of Merger dated February 5, 2013 (the "Merger Agreement").   Though the Merger Agreement contained a go-shop provision, it also provided Silver Lake with matching rights to any superior offer and a $180 million termination fee if the Board accepts a superior proposal during the go-shop period and a $450 million termination fee if it accepts one after the shop period.

10.     Following the announcement of the Proposed Acquisition, the Company engaged in a go-shop process that was designed to give the appearance that it was seeking the best possible price, but was merely a pretext.  Go-shop periods rarely lead to higher offers and despite serious interest from a few parties, the go-shop process carried out by the Company seems unlikely to yield one here.  Two potential acquirers Blackstone and Icahn Enterprises both made bids that were publicly acknowledged by the Special Committee to likely lead to superior offers for the Company.   However, Blackstone has since dropped out, in part because of its valid concern that the Board was unlikely to seriously consider its bid for the Company.  Meanwhile, Icahn Enterprises and Southeastern have proposed a number of alternative transactions that would present greater value to the public shareholders than the Proposed Acquisition, but the Board has demonstrated an unwillingness to seriously explore any of them and instead intends to

move towards consummating the Proposed Acquisition despite widespread shareholder opposition and the unfairness and inadequacy of the price and sales process.

11.     On March 29, 2013, the defendants filed with the SEC the materially false and misleading preliminary proxy statement (including all revisions thereto, the "Proxy") and the Rule 13E3 Transaction Statement (including all amendments thereto, the "Transaction Statement"). The Proxy, which recommends that Dell shareholders vote in favor of the Proposed Acquisition, and the Transaction Statement omit and/or misrepresent material information in contravention of sections 14(a) and 20(a) of the Exchange Act regarding: (i) the sales process leading to the Proposed Acquisition; (ii) financial analyses performed by J.P. Morgan Securities LLC ("J.P. Morgan") and Evercore Group L.L.C. ("Evercore"); and (iii) the Company's financial projections.

12.     As explained herein, the above omitted information is material to the impending decision of Dell shareholders whether or not to vote in favor of the Proposed Acquisition. As such, defendants' violations of sections 14(a) and 20(a) of the Exchange Act threaten shareholders with irreparable harm for which money damages are not an adequate remedy. Thus, plaintiffs seek injunctive relief to ensure that defendants cure their violations of law before Dell shareholders are asked to vote on the Proposed Acquisition.

13.     To remedy defendants' breaches of fiduciary duty and other misconduct, plaintiffs seek: (i) injunctive relief preventing consummation of the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for shareholders; (ii) a directive to the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Dell shareholders; (iii) rescission of, to the extent already implemented, the Merger Agreement or any of the terms

thereof; and (iv) a directive to correct the materially misleading Proxy before putting any matter to a shareholder vote.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Exchange Act for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction under 28 U.S.C. §1367, over the state law claims.

15.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b), (c), and (d).  Numerous defendants maintain their offices, have agents, transact business, and are found within this judicial district.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein arose in part within this judicial district, including the negotiations leading up to the execution of the Merger Agreement.  Finally, defendants inhabit and/or may be found in this judicial district and the interstate trade and commerce described herein are and have been carried out in part within this judicial district.

## PARTIES

17.     Plaintiff John Michael Van Buiten has been a shareholder at all times relevant hereto and is a shareholder of Dell.

18.     Plaintiff Iron Workers Mid-South Pension Fund has been a shareholder at all times relevant hereto and is a shareholder of Dell.

19.     Defendant Dell is a Delaware corporation with principal executive offices located at One Dell Way, Round Rock, Texas.  Dell is a leading integrated technology solutions provider in the IT industry that designs, develops, manufacturers, markets, sells, and supports a wide range of products, solutions, and services.  Dell operates through four global business segments: (i) Large Enterprise; (ii) Public; (iii) Small and Medium Business ("SMB"); and (iv) Consumer. Through these segments, Dell offers a vast portfolio of products, which includes laptops, desktops, electronics, tablets, and accessories as well as enterprise solutions and services, which include servers, networking, storage, and various IT services.  In the fiscal year ended February 3, 2012, Dell recorder net revenue of $62 billion and net income of almost $3.5 billion.  Upon completion of the Proposed Acquisition, Dell will become a wholly-owned subsidiary of defendant Denali Intermediate.

20.     Defendant M. Dell is Dell's CEO and has been since January 2007 and Chairman of the Board and a director and has been since May 1984.  Defendant M. Dell was also Dell's CEO from 1984 to July 2004.  Defendant M. Dell is Dell's founder.  Defendant M. Dell will also continue as Dell's Chairman of the Board and CEO following the completion of the Proposed Acquisition.  Defendant M. Dell will contribute his stake of roughly 14% of the Company's outstanding common shares toward the transaction, and will contribute additional cash in an amount up to $500 million through his private investment firm, MSD Capital, L.P. ("MSD Capital").  Defendant M. Dell will own a controlling stake (an approximately 71.6% equity interest) in the post-closing company.

21.     Defendant Alex J. Mandl ("Mandl") is Dell's Presiding Director and has been since December 2010 and a director and has been since November 1997.  Defendant Mandl leads the Special Committee that was formed to consider the Proposed Acquisition.

22.     Defendant Donald J. Carty ("Carty") is a Dell director and has been since December 1992.  Defendant Carty was also Dell's Vice Chairman and Chief Financial Officer from January 2007 to June 2008.

23.     Defendant Klaus S. Luft is a Dell director and has been since March 1995.

24.     Defendant William H. Gray, III is a Dell director and has been since November 2000.

25.     Defendant James W. Breyer is a Dell director and has been since April 2009.

26.     Defendant Shantanu Narayen is a Dell director and has been since September 2009.

27.     Defendant H. Ross Perot, Jr. is a Dell director and has been since December 2009.

28.     Defendant Gerard J. Kleisterlee is a Dell director and has been since December 2010.

29.     Defendant Janet F. Clark is a Dell director and has been since September 2011.

30.     Defendant Laura Conigliaro is a Dell director and has been since September 2011.

31.     Defendant Kenneth M. Duberstein is a Dell director and has been since September 2011.

32.     Defendant Silver Lake is a Delaware corporation global technology investment firm that manages approximately $14 billion.  Silver Lake has over 100 investment professionals and value creation specialists located in New York, Menlo Park, San Francisco, London, Hong Kong, Shanghai, and Tokyo.  Silver Lake is expected to contribute approximately $1 billion in cash toward the Proposed Acquisition.

33.     Defendant Denali Holding is a Delaware corporation owned by defendant M. Dell and investment funds affiliated with defendant Silver Lake.

34.     Defendant Denali Intermediate is a Delaware corporation and a wholly-owned subsidiary of Denali Holding.

35.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Denali Intermediate.  Upon completion of the Proposed Acquisition, defendant Merger Sub will merge with and into Dell and cease its separate corporate existence.

36.     The defendants named above in ¶¶20-31 are sometimes collectively referred to herein as the "Individual Defendants."

### INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

37.     Under Delaware law, the directors and officers of a publicly traded corporation have fiduciary duties of loyalty and care to shareholders.  Defendant M. Dell, as an officer and director of the Company, owes these same duties of care and loyalty to Dell's shareholders.  To diligently comply with these duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits themselves from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

38.     In accordance with their duties of loyalty, the Individual Defendants, as directors, officers, and/or majority shareholders of Dell are obligated under Delaware law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

39.     Finally, when a fiduciary stands on both sides of a transition, as is the case here, the transaction must be entirely fair to the Company's shareholders.  This means that the transaction must be the result of an entirely fair process and the result must be an entirely fair price.

40.     The Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith, and independence owed to plaintiffs and other public shareholders of Dell.  Certain of the defendants stand on both sides of the transaction, are engaging in self-dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiffs or the Class (as defined herein).  Accordingly, the Proposed Acquisition will benefit the Individual Defendants in significant ways not shared with the Class members.  As a result of the Individual Defendants' self-dealing and divided loyalties, neither plaintiffs nor the Class will receive adequate or fair value for their Dell common stock in the Proposed Acquisition.

41.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Acquisition, and

because defendant M. Dell is an insider, the largest shareholder of the Company, and stands on both sides of the transaction, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

### THE UNFAIR PROCESS LEADING UP TO THE PROPOSED ACQUISITION

42.     Defendant M. Dell founded Dell in 1984 and took it public in 1988.  For the last several years, he has contemplated returning Dell to its roots as a private company, but was waiting for the right opportunity to do so.  In a June 2010 interview, defendant M. Dell admitted that he had been considering such a transaction without disclosing any details on his efforts in that regard.

43.     Since 2005, Dell's share price has been on a downward spiral, declining by over 60% between 2005 and early 2012.  When Dell's share price continued to drop sharply in the first half of 2012, from over $18 per share in February to under $12 in June of that year, defendant M. Dell saw an opportunity to buy the Company on the cheap.  At that time, he began to seriously consider the possibility of buying out the public shareholders, but needed a financing partner to effectuate his buyout scheme.  The first people he approached were Egon Durban, a managing partner at the technology-centered private equity firm Silver Lake, and George R. Roberts, a partner at private equity firm K.K.R.  Defendant M. Dell is friends with both of these private equity executives and held separate discussions with both of them in Hawaii, where the three men have homes near each other.  Defendant M. Dell also had a longtime relationship with Mr. Durban's firm Silver Lake, having invested (through his investment firm MSD Capital) in the first fund raised by the private equity firm more than a decade ago.  Defendant M. Dell focused on K.K.R. and defendant Silver Lake alone as potential equity partners because of his

long standing and cozy relationship with each of the firms and because each of the firms would allow defendant M. Dell to have a controlling stake of the Company and to stay on as CEO.

44.     In June 2012, defendant M. Dell also discussed his idea with Southeastern, one of the Company's largest shareholders, which expressed an interest in rolling over a portion of its equity stake into the post-closing private company.  While defendant M. Dell continued to hold discussions with Southeastern, he was not interested in allowing existing shareholders other than himself to roll over their equity interests, wanting instead to maximize his stake in the go-private company and bring in just enough financing to complete the proposed transaction.

45.     On August 17, 2012, after being informed of defendant M. Dell's interest in taking the Company private, the Board decided to explore a sale of the Company to defendant M. Dell in addition to "various other strategic alternatives."  The Proxy is silent, however, on what other potential transactions (besides the defendant M. Dell buyout transaction), if any, were discussed at this meeting.

46.     The Board moved quickly in its pursuit of defendant M. Dell's proposed buyout transaction, creating a Special Committee, retaining J.P. Morgan as its financial advisor, entering into a confidentiality agreement with defendant M. Dell and potential equity sources defendant Silver Lake and K.K.R., and beginning to provide them with access to confidential documents by the end of August.

47.     On September 13, 2012, the Special Committee held a meeting with Brian Gladden ("Gladden"), the Company's Chief Financial Officer.  Gladden presented the Special Committee with management's projections for the Company's financial performance, which had been updated since shown to the Board in July 2012 (the "July Plan").  The Board questioned whether the July Plan remained accurate, and asked Gladden to further update the plan and to

extend the projections out two additional years to 2018.  On September 21, 2012, Gladden presented the revised projections to the Board.  The new projections, which are referenced in the Proxy as the "September 21 Case," reflected a materially worse financial outlook for the Company.

48.     On September 14, 2012, J.P. Morgan presented the Special Committee with its preliminary perspective on a potential sale of the Company and other strategic alternatives. Despite the fact that J.P. Morgan had identified a number of other potential financial buyers and noted that the leveraged buyout market was strong, the Special Committee decided to explore only defendant M. Dell's proposed go-private transaction with the two private equity firms K.K.R. and defendant Silver Lake rather than expand the process to other potential financial buyers, including those that may have preferred to acquire the Company without giving defendant M. Dell a majority stake in the Company.  J.P. Morgan also identified a list of potential strategic buyers and noted that a leveraged buyout transaction of the type and size contemplated by defendant M. Dell had not been done in the last five years, but the Special Committee also refused to contact any strategic parties or seriously explore any other potential alternative transactions.

49.     On October 23, 2012, defendant Silver Lake and K.K.R. submitted their defendant M. Dell-led bids for the Company, each of which contemplated that defendant M. Dell would rollover his existing equity stake into the private company.  Defendant Silver Lake proposed a purchase price of $11.22 - $12.16 per share while K.K.R. proposed a purchase price of $12 - $13 per share.  Both proposals assumed Southeastern would rollover its stock, and that defendant M. Dell would invest an additional $500 million.

50.     At a Special Committee meeting on October 27, 2012, Gladden explained the factors underlying the Company's undervalued share price and expressed management's belief that the September 21 Case–which although weaker than the July Plan, nevertheless projected stronger financial results than market estimates–accurately reflected the Company's expected financial performance.  For reasons not disclosed in the Proxy, the Special Committee appeared to ignore management's view of the Company and concluded the Company's outlook was less favorable.

51.     In November 2012, the Special Committee retained BCG as, according to the Proxy, a "management consultant to assist the Special Committee in evaluating" other strategic alternatives.  As it turned out, however, BCG's engagement consisted primarily of preparing projections in line with the Board's more pessimistic expectations.  The retention of BCG was a charade designed to give the appearance that the Special Committee was thoroughly evaluating all potential strategic transactions, when, in fact, it was already set on selling the Company to defendant M. Dell, regardless of whether such a transaction was in the best interests of the public shareholders.

52.     On December 3, 2013, K.K.R. told defendant M. Dell that it would not submit a revised offer for the Company and was withdrawing from the process, thereby leaving defendant Silver Lake as the lone remaining bidder and the apparent default winner.  As a result, defendant Silver Lake felt no pressure to drive up the offering price, instead bumping up its bid only slightly to $12.70 per share.

53.     On December 5, 2012, BCG gave a presentation to the Special Committee, in which it echoed management's position that Dell's share price did not adequately reflect the Company's fundamentals and prospects.  Nevertheless, based in part on the Company's input,

BCG later prepared three sets of projections, the BCG Base Case, the BCG 25% Case (which assumed that 25% of the projected cost reductions would be achieved), and the BCG 75% Case (which assumed that 75% of forecasted cost reductions would be completed), all of which projected materially lower financial results for the Company. These projections were relied upon by the Company's financial advisors in conducting their financial valuations of the Proposed Acquisition.

54.     At a Board meeting on December 6, 2012, defendant M. Dell laid out his four-point plan for restructuring the Company: (i) grow the Company's Enterprise Solutions and Services business through substantial investments in research and development and acquisitions; (ii) increase the size of the sales force; (iii) expand in emerging markets; and (iv) invest in the PC and tablets business (the "M. Dell Restructuring Plan"). Although defendant M. Dell expressed his desire to implement these initiatives after the Company was taken private, he did assure the Board that he would stay on to carry out the plan in the event Dell remained a public company. Nowhere in the Proxy does it mention whether the Board discussed the possibility of implementing the M. Dell Restructuring Plan or if it did, whether it asked management or its financial advisors to prepare any valuations or projections as part of its consideration of this proposed plan or the reasons why the Board ultimately chose not to pursue it.

55.     On December 13, 2012, the Special Committee invited one other private equity firm, TPG Capital LP ("TPG"), to submit an offer, but this was done merely to create the impression that the Company was doing all it could to obtain the highest possible price when, in fact, the Special Committee had already settled on the M. Dell/Silver Lake consortium as the buyer. Indeed, the Proxy reveals that, based on J.P. Morgan's advice, the Special Committee was aware prior to inviting TPG into the process that doing so at this late stage had little to no chance

of leading to an offer.  In addition, the Special Committee gave TPG a rushed deadline, requiring them to make an offer by December 21, 2012.  Predictably, TPG, without enough time to complete adequate due diligence and aware that defendant M. Dell was already firmly lined up with defendant Silver Lake, declined to submit an offer.

56.     On January 2, 2013, BCG made a presentation to the Special Committee, during which it discussed the impact of management initiatives (not the M. Dell Restructuring Plan), which would serve to improve the Company's performance.  In response to questioning, BCG admitted that the Company could take on these initiatives as a public company.

57.     In an effort to make up for its flawed and inadequate sale process, the Special Committee decided to hire a second financial advisor on December 28, 2012, and on January 8, 2013, retained Evercore as an additional financial advisor.

58.     On January 16, 2013, defendant Silver Lake submitted a written proposal on behalf of the M. Dell/Silver Lake buyout group to purchase the Company for $12.90 per share. Defendant Mandl told defendant M. Dell that he was pessimistic that the Special Committee would approve the going-private transaction at this low price, but defendant M. Dell responded that he thought such a transaction was the best course and pressured the Special Committee to finalize negotiations.

59.     On January 18, 2013, the members of the Board (with the exception of defendant M. Dell) met to discuss the latest offer on the table for $12.90 per share.  Although they considered this proposal to be inadequate, the Board was intent on completing a deal with defendants M. Dell and Silver Lake and directed its financial advisors to continue negotiations with defendants M. Dell and Silver Lake.  At this meeting, the Board also discussed the prices at

which the Special Committee would be prepared to recommend a transaction, but the Proxy is silent as to what these prices were.

60. On January 24, 2013, defendant Silver Lake notified J.P. Morgan that its final offer was $13.60 per share. On or around the same date, the Company received interest from a number of other parties about a potential transaction. Among them, strategic party GE Capital told Evercore that it was interested in purchasing the Company's financial services segment for approximately book value ($3.5-$4 billion). In addition, Blackstone called Evercore to say that it was interested in acquiring the Company. Also, Southeastern contacted Lawrence P. Tu, the Company's General Counsel, in order to request that it enter into a confidentiality agreement with the Company in order to review information about the going private transaction.

61. On January 24, 2013, the Special Committee met to consider M. Dell/Silver Lake consortium's latest offer. Despite also being made aware of interest from several other parties, including GE Capital, Blackstone, and Southeastern, in pursuing an alternative transaction, the Special Committee refused to seriously explore these potentially value-maximizing alternatives, instead putting them on hold until after it had finalized the M. Dell/Silver Lake buyout transaction.

62. On January 29, 2013, at a meeting with defendant Mandl, Southeastern told defendant Mandl that it believed the proposed buyout transaction by defendants M. Dell and Silverlake was inadequate and unfair to the public shareholders and proposed that, at a minimum, the public shareholders be given the option of receiving stock in any such transaction to enable them to share in the future upside of the Company. Because of its strong preference that the Company remain public, Southeastern informed the Special Committee that it would not support any going private transaction in the range of $14 to $15 per share if it did not have the

opportunity to roll over a portion of its equity into the private company.  When informed of Southeastern's proposal to keep the Company public, defendant M. Dell refused to even entertain such a possibility, immediately responding that he was "not interested in pursuing a transaction … in which public stockholders would retain an interest in the Company" and the Special Committee yet again went along with defendant M. Dell's wishes, refusing to explore other strategic transactions and moving forward with the go-private transaction.

63.     Over the next week, the Special Committee, defendant Silver Lake, defendant M. Dell, and their advisers negotiated the terms of the various agreements between the parties. On February 4, 2013, defendant Silver Lake slightly bumped up its offering price to $13.65 per share for the Company.  The Special Committee held a meeting that day and decided to recommend that the Board accept defendant Silver Lake's $13.65 per share proposal.  The members of the Board (besides defendant M. Dell, who was not present) unanimously approved a resolution approving the Proposed Acquisition, and the next day, the parties executed the Merger Agreement and announced the Proposed Acquisition in a press release.

## THE PROPOSED ACQUISITION

64.     On February 5, 2013, Dell issued the following press release announcing that the Company had entered into an agreement to be acquired by defendant M. Dell, in partnership with defendant Silver Lake, for $13.65 per Company share.  The press release announcing the Proposed Acquisition stated in pertinent part:

> Dell Inc. today announced it has signed a definitive merger agreement under which Michael Dell, Dell's Founder, Chairman and Chief Executive Officer, in partnership with global technology investment firm Silver Lake, will acquire Dell.
>
> Under the terms of the agreement, Dell stockholders will receive $13.65 in cash for each share of Dell common stock they hold, in a transaction valued at approximately $24.4 billion. The price represents a premium of 25 percent over Dell's closing share price of $10.88 on Jan. 11, 2013, the last trading day before rumors of a possible going-private transaction were first published; a premium of approximately 35 percent over Dell's enterprise value as of Jan. 11, 2013; and a

premium of approximately 37 percent over the average closing share price during the previous 90 calendar days ending Jan. 11, 2013. The buyers will acquire for cash all of the outstanding shares of Dell not held by Mr. Dell and certain other members of management.

The Dell Board of Directors acting on the recommendation of a special committee of independent directors unanimously approved a merger agreement under which Michael Dell and Silver Lake Partners will acquire Dell and take the company private subject to a number of conditions, including a vote of the unaffiliated stockholders. Mr. Dell recused himself from all Board discussions and from the Board vote regarding the transaction.

A Special Committee was formed after Mr. Dell first approached Dell's Board of Directors in August 2012 with an interest in taking the company private. Led by Lead Director Alex Mandl, the Special Committee retained independent financial and legal advisors J.P. Morgan and Debevoise & Plimpton LLP to advise the Special Committee with respect to its consideration of strategic alternatives, the acquisition proposal and the subsequent negotiation of the merger agreement.

The Special Committee also engaged a leading management consulting firm to conduct an independent analysis, including a review of strategic alternatives for Dell and opportunities for the company as a public entity, and thereafter engaged Evercore Partners.

The merger agreement provides for a so-called "go-shop" period, during which the Special Committee – with the assistance of Evercore Partners – will actively solicit, receive, evaluate and potentially enter into negotiations with parties that offer alternative proposals. The initial go-shop period is 45 days. Following that period, the Special Committee will be permitted to continue discussions and enter into or recommend a transaction with any person or group that submitted a qualifying proposal during the 45-day period. A successful competing bidder who makes a qualifying proposal during the initial go-shop period would bear a $180 million (less than 1 percent) termination fee. For a competing bidder who did not qualify during the initial go-shop period, the termination fee would be $450 million.

Mr. Mandl, lead director of Dell's Board of Directors, said: "The Special Committee and its advisors conducted a disciplined and independent process intended to ensure the best outcome for shareholders. Importantly, the go-shop process provides a real opportunity to determine if there are alternatives superior to the present offer from Mr. Dell and Silver Lake."

Mr. Dell said: "I believe this transaction will open an exciting new chapter for Dell, our customers and team members. We can deliver immediate value to stockholders, while we continue the execution of our long-term strategy and focus on delivering best-in-class solutions to our customers as a private enterprise. Dell has made solid progress executing this strategy over the past four years, but we recognize that it will still take more time, investment and patience, and I believe our efforts will be better supported by partnering with Silver Lake in our shared vision. I am committed to this journey and I have put a substantial amount of my own capital at risk together with Silver Lake, a world-class investor with an outstanding reputation. We are committed to delivering an unmatched customer experience and excited to pursue the path ahead."

**THE MERGER AGREEMENT IS DESIGNED TO FAVOR DEFENDANT M. DELL'S CHOSEN PARTNER, DEFENDANT SILVER LAKE**

65.     On February 6, 2013, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement.

66.     Though the Proposed Acquisition includes a go-shop provision that allows the Company to negotiate with other bidders for a forty-five day period following the execution of the merger agreement, the Merger Agreement contains provisions designed to favor defendants M. Dell and Silver Lake.  For instance, section 5.3(f) of the Merger Agreement contains a matching clause, which gives defendants M. Dell and Silver Lake four days to match any superior offer for the Company, and, if he does, the Company cannot terminate the Merger Agreement.  This section states:

> Except as set forth in this Section 5.3(f), neither the Company Board nor any committee thereof (including the Special Committee) shall (i) (A) change, withhold, withdraw, qualify or modify, in a manner adverse to Parent (or publicly propose or resolve to change, withhold, withdraw, qualify or modify), the Recommendation with respect to the Merger, (B) fail to include the Recommendation in the Proxy Statement, (C) approve or recommend, or publicly propose to approve or recommend to the stockholders of the Company, an Acquisition Proposal or (D) if a tender offer or exchange offer for shares of capital stock of the Company that constitutes an Acquisition Proposal is commenced, fail to recommend against acceptance of such tender offer or exchange offer by the Company shareholders (including, for these purposes, by disclosing that it is taking no position with respect to the acceptance of such tender offer or exchange offer by its shareholders, which shall constitute a failure to recommend against acceptance of such tender offer or exchange offer, provided that a customary "stop, look and listen" communication by the Board of Directors pursuant to Rule 14d-9(f) of the Exchange Act shall not be prohibited), within ten (10) Business Days after commencement (any of the foregoing, a "Change of Recommendation") or (ii) authorize, adopt or approve or propose to authorize, adopt or approve, an Acquisition Proposal, or cause or permit the Company or any of its Subsidiaries to enter into any Alternative Acquisition Agreement. Notwithstanding anything to the contrary set forth in this Agreement, prior to the time the Company Stockholder Approvals are obtained (but not after), the Company Board may (I) effect a Change of Recommendation if the Company Board determines in good faith (after consultation with its outside legal counsel and upon recommendation thereof by the Special Committee) that, as a result of a development or change in circumstances that occurs or arises after the execution and delivery of this Agreement (other than a Superior Proposal) that was not known to the Special Committee prior to the execution and delivery of this Agreement (an "Intervening Event"), failure to take such action could reasonably be expected to be inconsistent with the directors' fiduciary duties

under applicable Law and (<u>II</u>) if the Company receives an Acquisition Proposal that the Special Committee determines in good faith (after consultation with outside counsel and its financial advisors) constitutes a Superior Proposal, authorize, adopt, or approve such Superior Proposal and cause or permit the Company to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal; <u>provided</u>, <u>however</u>, that the Company Board may only take the actions described in (<u>1</u>) clause (II) if the Company terminates this Agreement pursuant to <u>Section 7.1(c)(ii)</u> concurrently with entering into such Alternative Acquisition Agreement and pays the applicable Company Termination Fee in compliance with <u>Section 7.3</u> and (<u>2</u>) clauses (I) or (II) if:

(i) the Company shall have provided prior written notice to the Parent Parties, of its or the Company Board's intention to take such actions at least four (4) Business Days in advance of taking such action, which notice shall specify, as applicable, the details of such Intervening Event or the material terms of the Acquisition Proposal received by the Company that constitutes a Superior Proposal, including a copy of the relevant proposed transaction agreements with, and the identity of, the party making the Acquisition Proposal and other material documents (including any financing commitments with respect to such Acquisition Proposal and any arrangements with the MD Investors or any of their Affiliates);

(ii) after providing such notice and prior to taking such actions, the Company shall have, and shall have caused its Representatives to, negotiate with the Parent Parties in good faith (to the extent the Parent Parties desire to negotiate) during such four (4) Business Day period to make such adjustments in the terms and conditions of this Agreement and the Financing as would permit the Company, the Special Committee or the Company Board not to take such actions; and

(iii) the Special Committee and the Company Board shall have considered in good faith any changes to this Agreement and the Financing or other arrangements that may be offered in writing by Parent by 5:00 PM Central Time on the fourth (4th) Business Day of such four (4) Business Day period and shall have determined in good faith (<u>A</u>) with respect to the actions described in clause (II), after consultation with outside counsel and its financial advisors, that the Acquisition Proposal received by the Company would continue to constitute a Superior Proposal and (<u>B</u>) with respect to the actions described in clauses (I), after consultation with outside counsel, that it would continue to be inconsistent with the directors' fiduciary duties under applicable Law not to effect the Change of Recommendation, in each case, if such changes offered in writing by Parent were given effect.

67.     The Merger Agreement also subjects Dell to another preclusive deal-protection provision in the form of termination fees.  To further discourage superior offers for Dell, a successful competing bidder would have to absorb payment to defendant M. Dell of a $180 million termination fee if its superior proposal is accepted during the go-shop period and a $450 million termination fee if its offer is accepted thereafter.  This additional consideration would be

paid directly to defendant M. Dell rather than Dell shareholders, thereby making it even more difficult for any competing bidder to acquire the Company.

68.     These onerous and preclusive deal protection devices render it unlikely that a successful competing bidder will emerge before the closing of the Proposed Acquisition, thereby ensuring that the unfair transaction is consummated so that the Individual Defendants can secure their own personal benefits.   Accordingly, the Individual Defendants' efforts to put their own personal interests before that of the Company's shareholders have resulted in a proposed transaction presented to Dell shareholders at an untenable and inadequate offer price.

### THE BOARD CONTINUES TO RECOMMEND THE PROPOSED ACQUISITION DESPITE RECEIVING SUPERIOR OFFERS AND THE COMPANY'S IMPROVING FINANCIAL PERFORMANCE

69.     The go-shop period was doomed from the start.  Given the significant head start of the M. Dell/Silver Lake buyout group from having already entered into the Proposed Acquisition, the deterring presence of defendant M. Dell (who had expressed an unwillingness to participate in any transaction that did not give him a controlling stake in the post-closing company), and the general reluctance of private equity firms to engage in bidding wars under the public scrutiny of a go-shop process, the deck was heavily stacked against any prospective bidder emerging to make a higher bid.   According to a research study conducted by FactSet MergerMetrics, since 2004, 196 mergers have included a go-shop period in them and yet less than 7% of them yielded even a competing bid.  Among management buyout transactions with a go-shop provision, the number leading to a competing offer is even fewer.  Still against these long odds and the oppressive deal protections in the Merger Agreement, a few parties did express interest during Dell's go-shop period in evaluating a potential strategic transaction with the Company.  One of those companies was Blackstone, which was internally divided over whether to pursue a bid because of its reluctance to engage in a bidding contest in the public eye and

because of its concern that it was being used as a stalking horse by Dell with little to no chance of prevailing. Nevertheless, Blackstone reluctantly decided to explore a transaction with the Company, informing Evercore that it would like to obtain confidential information regarding the Company on February 6, 2013. Despite Blackstone's request to enter into a confidentiality agreement almost immediately after the announcement of the Proposed Acquisition, the parties were not able to reach an understanding on the confidentiality agreement until February 22, 2013. Reflecting its lack of confidence that it could prevail in a bidding contest with defendants M. Dell and Silverlake, Blackstone made the unusual demand that the Company: (i) reimburse it for, not only its out-of pocket expenses, but the time spent by its executives participating in the process; and (ii) indemnify it for any litigation costs arising out of its participation in the go-shop process. The Special Committee, which desperately wanted Blackstone's participation in order to give the public impression that it was running a competitive sales process, eventually agreed to reimburse Blackstone for its out-of-pocket expenses incurred in evaluating a potential bid and fully indemnify the firm for its involvement in the bidding process.

70.     During the go-shop period, a number of other parties expressed an interest in buying portions, but not all, of the Company. However, unless these parties partnered with another party looking to acquire the rest of Dell, they were not allowed to conduct due diligence, receive access to the Company's data room, or be given consideration by the Special Committee.

71.     On March 5, 2013, Icahn Enterprises sent a letter to the Board stating that it believed the Proposed Acquisition substantially undervalued the Company. Along with Southeastern, Icahn Enterprises proposed that the Company conduct a dividend capitalization instead of the Proposed Acquisition, stating that such a transaction offered substantially more value to shareholders (valuing it at close to $23 per share in comparison to the Proposed

Consideration of $13.65 per share).  In fact, Icahn Enterprises felt so strongly that it demanded that the Board declare a dividend of $9 per share under such a proposed capitalization plan or else face a proxy fight for control of the Board.  In response, the Board showed no interest in exploring this potentially value-maximizing transaction and instead sought to pacify Icahn Enterprises by offering to reimburse it for its expenses related to a bid for the Company in return for agreeing not to launch a proxy fight.  The Board similarly sought to co-opt Southeastern by engaging in talks to allow it alone to roll-over its equity stake in the Company.

72.     On March 21, 2013, GE Capital submitted an indication of interest to purchase Dell's financial services business, but was forced to team up with Blackstone's bid because of the Special Committee's requirement that only bidders for the entire company would be eligible to receive due diligence materials or garner the consideration of the Special Comittee.  The Proxy does not disclose the terms of this asset bid or whether the Special Committee considered it.

73.     On March 22, 2013, a consortium led by Blackstone made an offer to acquire the Company.  Though still at an early stage, Blackstone's proposal was at a significantly higher price than defendant Silver Lake's offer.  In particular, Blackstone's offer was that holders of shares of Dell common stock would be entitled to elect to receive cash in an unspecified amount that was stated to be in excess of $14.25 per share or to roll over their shares, subject to a cap (which was not specified) on the amount of equity that could be rolled over. Blackstone's proposal also contemplated that the Company would remain public, as it expected to invite certain of the Company's stockholders and other strategic and financial partners to participate in the transaction as part of the buying group.  Although Blackstone did not take a public position on whether it wanted defendant M. Dell to remain on as CEO of the Company in the event its bid won out, Blackstone knew that defendant M. Dell was unlikely to support Blackstone's

acquisition of the Company (or any transaction, for that matter, that did not make him the controlling shareholder) and, as a result, began privately approaching potential replacements for defendant M. Dell.

74.     Also, on March 22, 2013, Icahn Enterprises made an offer to acquire the Company that would allow the Company to remain public.  Icahn Enterprises' proposal would allow Dell common stockholders to elect to roll over their shares on a one-to-one basis or to sell their shares for cash in an amount equal to $15 per share, with a cap of approximately $15.6 billion on the total amount of cash that could be paid out (with pro rata cutbacks if the cash election is oversubscribed).  In an attempt to preclude Icahn Enterprises from making a hostile bid for the Company, the Special Committee offered to pay all of its out-of-pocket expenses related to its bid for the Company in exchange for signing a standstill agreement.  Recognizing that the Board was unlikely to seriously consider any proposal offered by it or any other party, Icahn Enterprises refused the offer in order to keep its options open.

75.     At its March 24, 2013 meeting, the Special Committee admitted that both Blackstone's and Icahn Enterprises' proposals could reasonably be expected to result in superior proposals to defendant Silver Lake's proposed acquisition of the Company.  Nevertheless, the next day, the Special Committee issued a press release announcing that it continued to support the Proposed Acquisition.

76.     In a late March 2013 interview with ZDNet, John A. Swainson, President of Dell's software division, stated that "the corporate structure of Dell doesn't make a difference on how customers interact with our products or how we develop or sell them," which undermined defendant M. Dell's asserted rationale for the Proposed Acquisition—that the Company would function better as a private company.

77.    On April 9, 2013, Southeastern sent a letter to the Special Committee in which it sharply criticized defendants for selling the Company for an unfair price and through an unfair and limited sales process.   The letter, which sets forth in detail Southeastern's reasons for opposing the Proposed Acquisition, states, in its entirety, that:

> As the beneficial owner of 8.4% of Dell Inc.'s outstanding shares, we are writing today to express our views regarding the Company's proxy statement. It is our position that the proxy statement fails to make a case for shareholders to accept the $13.65 per share Michael Dell / Silver Lake buyout offer. In addition, we believe that the Special Committee conducted a process that resulted in an inadequate outcome.
>
> According to the proxy statement, Mr. Dell notified the Board of his intention to take the Company private in August 2012. The proxy statement clearly shows that, in their review, the Special Committee and Board of Directors reached conclusions that stand in stark contrast to views held by the Board prior to August 2012. While the Special Committee may have worked diligently and was assisted by credible and reliable professionals, even a good process – without the exercise of proper business judgment – can result in a bad transaction.
>
> **The Proxy Reveals a Robust Process Leading to an Inadequate Result**
>
> Over the last two years, under a Board authorized program, the Company has repurchased 224,000,000 shares for $3.4 billion at an average price of over $15.25 per share. The same Board that was confident with Dell buying its shares for $15.25 is now attempting to convince all shareholders that Dell's business is in such dire straits that they should take $13.65 and exit their investments. We believe the Board's sudden rush to sell is triggered by one thing: Mr. Dell's desire to buy.
>
> Furthermore, the proxy statement and the analysis performed by the Special Committee focus disproportionately on the End User Computing (EUC) business indicates that at the completion of the Company's transformation to ESS, Dell's future owners should realize valuation multiples significantly higher than those reflected in the current offer price.
>
> **It is not about the PC. It is not about the PC. It is not about the PC…**
>
> Management has repeatedly highlighted the ESS business on previous earnings calls and provided estimates that show that ESS will account for 35% of the Company's fiscal 2014 estimated revenue and 58% of its fiscal 2014 estimated Non-GAAP operating income (OI). Because the 58% of Dell's 2014 estimated Non-GAAP OI attributable to ESS is worth a much higher multiple than the 42% of Company profits tied to the EUC segment, **the ESS business, Dell's cash and Dell Financial Services (DFS) are worth far more than half of total corporate value (see Table 1).**

**Table 1: Business Contributions**[2]

(B = Billions of USD)

| | Revenues | | Non-GAAP OI | | Value | |
|---|---|---|---|---|---|---|
| | (FY14E) | % of | (FY14E) | % of | Range | % of |
| EUC[1] | $ 36 B | 65% | $ 1.5 B | 42% | $    7-8 B | ~18% |
| ESS | 19 B | 35% | 2.0 B | 58% | $   20-25B | ~55% |
| Net Cash + DFS | -- | NMF | -- | NMF | $    11 B | ~27% |

(1) Includes the PC business and PC-related operations of the Support & Deployment and Software & Peripherals businesses
(2) Estimates based on numbers from Dell FY14 projections and Wall Street estimates

Yet, in all the analytical work and the voluminous proxy statement, EUC and PC are referenced hundreds of times more frequently than ESS. This is a stark contrast to the Company's prior emphasis on the emerging value of ESS. Given this change in public positioning, Dell's shareholders should question why the Board is suddenly focused on EUC, and not on ESS – which was previously believed to be the future of the business.

In addition, the Board's approach of initially limiting the potential acquirers to private equity firms that would allow Mr. Dell to have majority ownership of the Company and remain as CEO narrowed the potential bidders materially and contributed to the Board's approval of a transaction at a price that undervalues the Company.

In fact, within the proxy statement, virtually every justification of the $13.65 per share price is based on a premium to market at the time of the analysis. Such an approach is misleading when it is based on a price at the low end of the trading range over the last 15 years. Instead, any valuation analyses should have compared the $13.65 offer price to the net asset value of the Company. Additionally, the valuation analysis should have focused on an appropriate multiple of the Company's free cash flow per share, more than half of which is from the growing ESS business, plus the net cash on the balance sheet and the value of DFS.

### *The Special Committee Gave Limited Consideration to Shareholder Friendly Alternatives*

In our February 8, 2013, letter to the Board, we stated that we would have been prepared to support a leveraged recapitalization and suggested it could have been done in the form of a $12 per share special dividend, a Dutch auction or another structure that would have allowed shareholders an opportunity to participate in Dell's future. Despite the viability of such a transaction, the proxy statement shows that the Board and Special Committee spent little time researching a leveraged recapitalization. The lengthy proxy statement only discusses the "pros" and "cons" of a leveraged recapitalization on a handful of pages and in only a cursory manner. The proxy statement also does not provide any real analysis or give any attention to solutions that would have either allowed shareholders to receive a large special dividend or to remain shareholders of a company with a smaller share base. It appears that neither the Board nor the Special Committee aggressively pursued the leveraged recapitalization idea because senior management preferred a go-private transaction.

In addition, as widely reported, management spent over $13 billion on acquisitions of non-PC businesses which benefit from the very same cloud and mobility trends that are negatively impacting the PC business. Long-term owners

such as Southeastern have supported Dell in its transformation into an enterprise solutions company, but are not being given the opportunity to participate in the return on that $13 billion investment.

On January 29, 2013, Southeastern sought a meeting with the Special Committee in response to market leaks regarding a reported go-private transaction. In that meeting, we asked the Special Committee why giving shareholders a choice, through some form of cash/stock election, would not be preferable, and in fact fairer, for those shareholders who want to participate in the Company's upside. Dell's proxy statement answers that question: quoting from page 38, "Mr. Dell and Silver Lake were not interested in pursuing a transaction such as the one proposed by Southeastern in which public stockholders would retain an interest in the Company."

### The Proxy Statement Contains No Justification to Take Dell Private

The proxy statement does not contain any sound reasoning for why, at this stage in the transformation, the Company needs to be taken private. In the entire proxy statement, we found only one page (page 82) devoted to Mr. Dell's plans for the Company following the transaction. That single page is consistent with the Company's prior public statements, and nothing about these plans requires that the Company be private.

In fact, in an interview with ZDNet two weeks ago, John Swainson, head of Dell's software unit, essentially confirmed that it doesn't matter whether Dell is public or private. He said, "the corporate structure of Dell doesn't make a difference on how customers interact with our products or how we develop or sell them." We note that many companies, including IBM, were able to successfully transform their businesses as public companies. In addition, BCG, an advisor to the Special Committee stated that "many of the 'take-private' value levers could (in principle) be applicable to [Dell] as a public company."

The proxy statement reveals that the Board had become increasingly frustrated with management's execution of the transition, and rather than try to solve the problem, it chose to give Mr. Dell the opportunity to purchase the Company from shareholders at an inadequate price. Mr. Dell would not be participating in the proposed go-private transaction if he did not believe in the Company's future upside and his ability to execute the transformation of the business.

### The Special Committee Has the Power to Act in the Best Interests of All Dell Shareholders

As we noted above, we believe the proxy statement fails to make a case for shareholders to accept the $13.65 per share Michael Dell / Silver Lake buyout. For shareholders trying to decide whether to support the transaction, the Company's suspension of earnings guidance and extremely limited discussion of the Company's future plans will make it difficult to make an informed choice. In the next draft of the proxy, the Special Committee should provide sufficient detail about Mr. Dell's future plans so that public shareholders can properly evaluate their options.

The Special Committee has obtained two preliminary alternative proposals, both of which we view as superior to the Michael Dell / Silver Lake buyout. We view these proposals as superior primarily because each offers shareholders the

opportunity to remain owners of Dell while also offering a higher cash price to owners who choose to exit their investment.

Southeastern urges the Special Committee to negotiate and evaluate these alternatives in good faith, and to recognize that offering shareholders a choice is a win/ win outcome for all parties. We call upon the Special Committee to work hard to make this possibility a reality.

78.     On April 18, 2013, Blackstone dropped out of the sales process, leaving Icahn Enterprises as the only remaining bidder.  Blackstone's withdrawal was not surprising given its reluctance from the start to join the bidding process and its continuing concern that the Special Committee would never seriously consider its bid and that it was merely using Blackstone's interest in the Company to cover up its failure to run any semblance of a competitive sales process.  Although after receiving Blackstone's initial proposal, the Special Committee had stated publicly that it was exploring Blackstone's bid, Blackstone never had much chance of winning the approval of the Board, particularly given that its bid contemplated the Company remaining public rather than allowing defendant M. Dell to gain a controlling stake (which defendant M. Dell adamantly opposed), and that it was privately exploring replacing defendant M. Dell as CEO of the Company.

79.     On May 9, 2013, Icahn Enterprises and Southeastern (who collectively owned a nearly 13% equity interest in the Company) submitted a letter to the Board proposing another alternative to the Proposed Acquisition that would allow the Company to both remain public in the long term and return substantial value to the public shareholders in the short term.  Under this proposed alternative transaction, the Company would pay a $12 dividend to shareholders, in either cash or shares, while still allowing the public shareholder to hold onto their shares in the Company.  In their letter, Icahn Enterprises and Southeastern severely criticized the Board's deliberations as inadequate and unduly favoring the M. Dell/Silver Lake buyout bid, expressed their view that the Company was poised to turnaround its financial performance in the near

future, and threatened to launch a proxy fight if their proposal was rejected. The letter states, in

its entirety, that:

> We are a group of Dell Inc. shareholders that own in the aggregate approximately 13% of the outstanding shares of Dell Inc. From the announcement of the Agreement and Plan of Merger, dated as of February 5, 2013 (the "Going Private Transaction) we have stated repeatedly that we believe that the Going Private Transaction is not in the best interests of Dell shareholders and substantially undervalues the company. As a result, we will vote against the Going Private Transaction.

**THE ICAHN/SOUTHEASTERN PROPOSAL**

AS AN ALTERNATIVE TO THE GOING PRIVATE TRANSACTION WE MAKE THE FOLLOWING PROPOSAL:

1. IN OUR PROPOSAL DELL SHAREHOLDERS WOULD HAVE THE RIGHT TO CONTINUE AS OWNERS AND KEEP THEIR EXISTING EQUITY POSITION IN DELL.

2. <u>IN ADDITION</u> IN OUR PROPOSAL DELL SHAREHOLDERS WOULD BE GIVEN THE OPPORTUNITY TO ELECT TO RECEIVE A DISTRIBUTION OF: (X) $12.00 PER SHARE IN CASH, OR (Y) $12.00 IN ADDITIONAL SHARES VALUED AT $1.65 PER SHARE. BOTH ICAHN AND SOUTHEASTERN WOULD ELECT TO RECEIVE ADDITIONAL SHARES RATHER THAN CASH.

3. FINANCING FOR OUR PROPOSAL WILL BE OBTAINED FROM EXISTING CASH AT DELL AND APPROXIMATELY $5.2 BILLION IN NEW DEBT. IT SHOULD BE NOTED THAT THE MICHAEL DELL GOING PRIVATE TRANSACTION PROVIDES FOR AN AGGREGATE OF APPROXIMATELY $16 BILLION OF DEBT. HOWEVER, IN ANY CASE WE INTEND TO OBTAIN A BRIDGE LOAN TO GUARANTEE THE AVAILABILITY OF THE $5.2 BILLION OF NEW DEBT FOR OUR PROPOSAL. WE BELIEVE THAT OUR PROPOSAL IS SUPERIOR TO THE GOING PRIVATE TRANSACTION, IN THAT UNDER OUR PROPOSAL SHAREHOLDERS CAN RECEIVE $12 IN CASH AND STILL SHARE IN THE FUTURE OF DELL, AN OPPORTUNITY THAT WE THINK IS WORTH SIGNIFICANTLY MORE THAN $1.65 PER SHARE (SEE BELOW).

**THE DELL GOING PRIVATE TRANSACTION - - THE "GREAT GIVEAWAY"**

We want this Board to hear from both Icahn and Southeastern loud and clear that it is insulting to shareholders' intelligence for the Board to tell them that this Board only has the best interests of shareholders at heart, and then accept Michael Dell's offer to purchase the company he founded for $13.65 per share, a price far below what we consider its value to be. You not only sanctioned Michael Dell's offer, which amazingly allows him to purchase the company from shareholders with their own money but, to add insult to injury, you have agreed to give Mr. Dell a break-up fee of up to $450 million.

We are often cynical about corporate boards but this Board has brought that cynicism to new heights. When Mr. Dell, who knows this company better than anyone on the planet, offered to purchase the company, why couldn't the Board give shareholders the choice of either taking the money that Michael Dell offered or offer shareholders an obvious alternative which would give shareholders basically the same amount of cash Mr. Dell was offering but also allow them to continue to profit if the company prospered? After all, many loyal shareholders held on while management and the Board oversaw the decline of the company these many years. Instead, astonishingly, we believe the Board basically said "thank you Michael for offering to purchase the company with the shareholders' own money at a bargain price and, by the way, if anyone dares to offer a higher value like our proposal and you don't want to compete with it, have no fear because we will award you a break-up fee of up to $450 million. And even if we find the competing offer to be a "superior offer", we will still pay you at least $180 million."

Evercore Partners, the investment banker Dell purportedly hired to euphemistically "go shop" the company, has told Mr. Icahn on more than one occasion that the "independent committee" has only one concern, and that is to do what is right for shareholders. Our proposal gives the Board a final chance to prove that what they say is correct. The following explication of the offer makes it abundantly clear that our proposal is "superior". However, in the event that the Board does not find our offer to be "superior" and insist on presenting the Dell offer for a shareholder vote, <u>we will work assiduously to persuade all shareholders to reject the Dell offer</u>. We will then, at the annual meeting, put up a slate of 12 directors to challenge the current board. If elected, our slate will effectuate our proposal as discussed below.

This company has suffered long enough from very wrong-headed decisions made by the Board and its management. Do not make another by putting the company through an unnecessary debilitating proxy fight. Allow the shareholders to decide for themselves which offer they choose.

## SHAREHOLDERS SHOULD BE ABLE TO STICK WITH THEIR DELL STOCK, WHICH HAS GREAT POTENTIAL FOR GROWTH

It is not lost on shareholders that instead of working for them in an effort to regain Dell's prior value, that Michael Dell would rather buy Dell from shareholders at trading levels more in line with the late 1990s. We have great respect for Michael Dell for creating and building Dell and also for the "negotiating" ability he has shown in getting his Board to grant to him this almost absurd bargain. However, we believe all shareholders (at their discretion) should have the opportunity to participate in the upside potential we believe is present, not solely Michael Dell and an opportunistic buyout group leveraging to the hilt the company's own assets with very little of their own equity. We believe that it is obvious that the Board and managements' significant technological and strategic misses have driven a 50%+ decline in Dell shares over the recent years and culminated in a substandard insider offer to purchase the company. This is the reason why we are here today.

In an effort to justify its giveaway agreement with Michael Dell, the Board has laid out several potential operating cases. But shareholders were not also shown alternative cases, which in our view would yield a significant opportunity for upside. We believe the Board focuses primarily on mature business lines, proposes limited operational improvements, does not recognize meaningful long-

term revenue growth drivers and offers no capital structure improvements. Despite this methodical sleight of hand and supporting public relations campaign, we firmly believe there are several more positive operating cases that were not shared that we believe would conservatively support a superior value.

To no one's surprise the PC market is challenged. However, in our view, it is far from an obsolete technology, but one that is maturing and ultimately somewhat cyclical. Furthermore, in our view, the PC is not where the ultimate long-term opportunity lies for Dell, something we are confident Michael Dell is betting on, while leaving shareholders out in the cold. At the end of the day, we believe the current Dell proposal grossly under-values the long-term prospects of the company's numerous varied businesses and opportunities that a capable management would capitalize on.

Dell has a meaningful opportunity to upgrade its overall global operations. This includes reining in years of excessive and bloated overhead, marketing and supply chain costs as highlighted by BCG. Simply by taking a look at the Dell website, one can extrapolate the multitude of almost infinite product options. Dell's complexity comes at a steep cost. Even more importantly the excessive customization options no longer suit the marketplace needs. We believe the reality is a small percentage of SKUs actually make up a meaningful percentage of overall revenues. By reducing SKUs and configurations, we believe Dell has the opportunity to immediately address the permanent cost disadvantages it has when compared to several offshore competitors. It is also to no one's surprise that the entire industry has moved from a build to order model to a more efficient build to stock model. We also believe that Dell has a meaningful opportunity to rationalize fulfillment centers and merge assembly plants where appropriate. This may also include returning some manufacturing onshore closer to U.S. based customers, a potential boon to domestic manufacturing jobs. Finally, we believe there exists thoughtful opportunities to spin-off particular business units that are no longer core. Collectively, we believe there is a significant cost saving opportunity as noted in the BCG reports filed by Dell, that will not only greatly improve Dell's competitive position globally but also set the company up to excel in the marketplace for years to come.

Most importantly, we note Dell is not solely a cost story. Dell is a proud 29 year old global brand with key relationships with some of the world's most dynamic suppliers (including Microsoft and Intel which have a vested interest in Dell's success), enterprises (small, medium and large), and individual loyal customers. We truly believe the best days for Dell are yet to come and the company has a tremendous opportunity to build on its strong platform. We believe by targeting such growth sectors as packaged business applications, cloud based solutions, and facilities automation, among many others, Dell is poised to expand in areas with meaningful potential value. Dell should also look to smartly grow opportunistically through value-added acquisitions in key areas such as business applications and networked storage while continuing to leverage the nearly $14billion in historical acquisitions executed to expand beyond the core PC business. Finally, we cannot underestimate the international opportunities we believe Dell can capitalize on, particularly in emerging markets including China, India and Brazil. These markets are important today and increasingly so over the long-term. For instance the China PC market has already surpassed the size of US market. Dell needs to continue to position itself as the vendor of choice in these markets.

It does not take a mathematician to understand that $12.00 in cash and a stub equity component with, as outlined in our view, significant upside operating potential, is superior to only $13.65 in cash. The Going Private Transaction leaves all of the upside to Michael Dell and an opportunistic buyout group with only their own interests in mind. However, under our proposal, assuming 20% of the current shares outstanding (including those held by Icahn and Southeastern) elect not to receive any cash consideration and receive stock consideration, we estimate * the remaining stub will earn between $0.50 and $0.89 in annual near-term pre-tax EPS with potential long-term earnings above this current depressed level, as we execute on our aforementioned plans. Assuming a mere 4.0x-6.0x multiple would ascribe what we view as a fair value at between $1.98 and $5.35 consideration (a similar value is arrived at using EV/EBITDA methodology). This is simple math, which shows the substantial upside potential optionality when compared to the $1.65 additional cash available from Michael Dell. To us this is a no brainer. Our proposal will also leave the company less levered than the proposed Going Private Transaction. The question remains in our mind, why support a management team that would in our opinion, rather over leverage, a private company with a buyout partner than operate under conservative assumptions publicly to the benefit of all shareholders?

*We believe Dell can make the needed transition from an elite maker of computers to a global provider of services to enterprises and thrive as a public company. Dell just needs the right management team in place to execute on the opportunity we have laid out, a team that is incentivized to work for all shareholders and not just themselves - - a team that we believe a new board operating outside of the constraints of this hostile situation, could certainly assemble.* We wholeheartedly believe shareholders deserve the right to participate in Dell's transformation, which is already underway. We have no doubt that Dell will emerge as a complete global end to end solutions provider for its customers including software, services, enterprise and user computing. Most importantly, we believe shareholders such as ourselves should be there too.

The Icahn team, as investors actively involved on corporate boards, has experienced many significant successes with struggling businesses that were turned around from the date that our nominees joined those boards, by new management teams they helped to install. For example, Biogen (gain in excess of approximately $35 billion in shareholder value), Motorola Mobility (gain in excess of approximately $3 billion in shareholder value), Imclone (gain in excess of approximately $3.5 billion in shareholder value) and Chesapeake (gain in excess of approximately $1 billion in shareholder value) to name a few. We believe that, with the help of directors selected by Icahn and Southeastern, Dell could also achieve great success with new management. We further believe that it would be unconscionable for the Dell Board to deny shareholders the opportunity to participate in that potential for success. In fact, we believe that if the Board does deny shareholders this choice and Michael Dell makes large returns by buying Dell at $13.65 per share the Board should be held personally accountable and liable.

## THE CHOICES FOR THE DELL BOARD AND DELL SHAREHOLDERS

As Icahn has expressed to Dell's financial advisor, Evercore Partners, we believe that our proposal is better for all Dell shareholders - - not just Michael Dell. *We urge the Board to put our proposal before Dell's shareholders, preferably by recognizing it as a Superior Proposal and proceeding with our proposal in lieu*

*of the Going Private Transaction, or alternatively by calling an annual meeting simultaneously with the vote of shareholders on the Going Private Transaction.*

If this Board will not agree to our proposal, then we request that the Board announce that it will combine the vote on the Going Private Transaction with an annual meeting to elect a new board of directors. We then intend to run a slate of directors at the Dell annual meeting that, if elected, will implement our proposal as set forth above. In that way shareholders will have a real choice between the Going Private Transaction and our proposal.

We believe that Dell was not properly shopped in the period that led to the signing of the merger agreement with Michael Dell. In the circumstance of Dell, neither a "go-shop" nor a "no-shop" period can be considered an adequate substitute for properly shopping the company prior to entering into any merger agreement. By signing up with Michael Dell and promising his group a breakup fee of from $180 million to $450 million the company facilitated his bid by providing the money to pay for lender commitments if the Going Private Transaction fails. We believe that this is a massive and unfair advantage to Michael Dell.

Given that fact, and the fact that a significant percentage of your shareholders have already indicated their dissatisfaction with the Going Private Transaction, the Dell board should do the right thing and provide shareholders with the opportunity to vote for our proposal side by side with the Going Private Transaction in a <u>single meeting</u> and Dell should do everything necessary to create a level playing field, including holding the annual meeting and the vote on the Going Private Transaction at a single meeting.

We continue to believe, as apparently does Michael Dell and his partner Silver Lake, that the future of Dell is bright. We see no reason that the future value of Dell should not accrue to ALL the existing Dell shareholders — not just Michael Dell. IF THE GOING PRIVATE TRANSACTION TURNS OUT TO BE A HOME RUN FOR MICHAEL DELL IN THE COMING YEARS, WHICH WE EXPECT WILL IN FACT OCCUR, IT MAY WELL BE ATTRIBUTED TO AN ERROR BY THE DELL BOARD. THIS IS THE LITIGATION RISK THAT YOU NOW FACE. EITHER GIVE SHAREHOLDERS THE REAL CHOICE THEY ARE ENTITLED TO OR FACE THE LEGAL LIABILITY FOR YOUR FAILURES.

***YOU NOW HAVE THE OPPORTUNITY TO AMELIORATE THE DAMAGE THAT WE BELIEVE YOU HAVE CAUSED TO DELL AND ITS SHAREHOLDERS BY FOLLOWING THE FAIR AND REASONABLE PATH SET FORTH IN THIS LETTER.*** IT IS NOT TOO LATE TO DO THE RIGHT THING, AND THEREBY ANSWER THE ONGOING CRITICISM AND LEGAL ATTACKS THAT THE GOING PRIVATE TRANSACTION HAS ATTRACTED.

80.    In a letter dated May 13, 2013, the Special Committee publicly signaled that it would not take the Icahn Enterprises/Southeastern May 9 proposal seriously.  In its letter, the Special Committee questioned the viability of the proposed alternative transaction and requested

that Icahn Enterprises provide a long list of detailed items regarding the proposal, including specifying how it would be financed and the arrangements to provide working capital or other liquidity following the closing, identifying the members of the senior management team, and submitting a draft of the definitive agreement.  The Special Committee's response was designed to publicly discredit the proposal and forestall any efforts by Icahn Enterprises and Southeastern to launch a proxy fight over control of the Board or attempt to place this proposed transaction before the shareholders.

81.     To address the Special Committee's lengthy list of concerns and questions, Icahn Enterprises and Southeastern reasonably asked for additional due diligence materials from the Company.  In response, the Special Committee publicly stated that they would not provide any due diligence information or engage in any talks until they received a proposal they deemed to be "superior."  By refusing to cooperate at all with Icahn Enterprises and Southeastern, in addition to giving less than favorable responses to the Blackstone and GE Capital's prior proposals, the Special Committee has confirmed that it has no intention of seriously considering any alternative transactions and will proceed towards consummating the Proposed Acquisition.

## THE PROPOSED ACQUISITION UNDERVALUES DELL

82.     The Proposed Consideration of $13.65 per Dell share substantially undervalues the Company.  The most obvious evidence that the Proposed Consideration undervalues the Company is that each of the proposals made by Blackstone and Icahn Enterprises are substantially higher than $13.65 per share.

83.     Even without the Blackstone and Icahn Enterprises proposals, the Special Committee and the Board were well aware that the Proposed Consideration undervalued the Company.  J.P. Morgan presented the Special Committee and the Board with valuations of the Company using public and non-public information.  Using Dell's management's projections, J.P.

Morgan concluded that the Company has an implied stock value between $15.50 and $21.75. While J.P. Morgan attempted to downplay these values by calling management's projections "optimistic," when it used BCG's projections assuming the Company was able to implement 75% of its strategic initiatives, it valued the Company between $15 and $21.25, nearly in line with management's numbers.  The table below shows J.P. Morgan's valuation of the Company.



84.     In the Proxy, the Board mentions that there could be difficultly in implementing the Company's strategic initiatives.  However, since 2008, the Company has successfully implemented similarly dramatic measures to build long-term growth and transform itself from a PC company to a services firm based upon end-to-end IT solutions focusing on software.

85.     The Company's transformation is supported by an investment of more than $13 billion in acquisitions of various companies, including, but not limited to: (i) the Company's 2009 purchase of Perot Systems; (ii) the Company's 2010 purchase of KACE Networks; (iii) the

Company's 2010 purchase of Exanet Ltd.; (iv) the Company's 2010 purchase of Scalent Systems Inc.; (v) the Company's 2010 purchase of Ocarina Networks; (vi) the Company's 2010 purchase of Boomi; (vii) the Company's 2010 purchase of Compellant Technologies; (viii) the Company's 2011 purchase of SecureWorks Inc.; (ix) the Company's 2011 purchase of RNA Networks; (x) the Company's 2011 purchase of Force10 Networks Inc.; (xi) the Company's 2012 purchase of AppAssure; (xii) the Company's 2012 purchase of Clerity Solution; (xiii) the Company's 2012 purchase of Make Technologies; (xiv) the Company's 2012 purchase of Quest Software; (xv) the Company's 2012 purchase of SonicWALL Inc.; (xvi) the Company's 2012 purchase of Wyse Technology; and (xvii) the May 2013 acquisition of Enstratius, an award-winning enterprise cloud-management software and services provider.  Each of these acquisitions was of a company that enhanced Dell's ability to compete in the service and software business.  As stated by defendant M. Dell during the Company's earnings results announcement on November 15, 2012, these acquisitions "add[] leading management, security, virtualization and cloud capabilities to [Dell's] expanding portfolio of powerful solutions."

86.     The Company's new strategy is already showing signs of success.  For instance, in the third fiscal quarter of 2013, Dell's Enterprise Solutions and Services revenue grew 3% year-over-year and server and networking revenue increasing 11% year-over-year.  These businesses continued their growth in the fourth fiscal quarter of 2013, for which Dell recently reported a 6% year-over-year increase in Enterprise Solutions and Services revenue and a 40% year-over-year increase in networking revenue, including more than 100% growth in the Company's Force10 business, which Dell acquired in August 2011.  For the first quarter of fiscal year 2014, Dell saw even more growth in its Enterprise Solutions and Services business, increasing revenue by 12%.

87.     Dell's results for its recent fiscal year ended February 1, 2013 are extremely close to the projections that management provided to the Board, which the Company was not expected to reach until its next fiscal year 2014.  In particular, for fiscal 2013 Dell reported revenues of $56.9 billion, non-GAAP[1] gross margin of $12.7 billion, non-GAAP operating income of $4 billion, and non-GAAP net income of $3 billion, compared to fiscal 2014 projections of $59.9 billion, $13.7 billion, $4.2 billion, and $3.2 billion, respectively.  Accordingly, despite J.P. Morgan calling the management projections "optimistic," Dell seems poised to meet or exceed the internal expectations which resulted in J.P. Morgan giving the Company an implied value of $15.50 to $21.75.

88.     Major analysts agree that Dell's stock is worth significantly more than the Proposed Consideration.  Nine analysts have price targets above the Proposed Consideration price of $13.65 per share, with certain analysts' targets ranging as high as $18 per share.  Many of these analysts had price targets above the offer price long before any rumors had emerged regarding negotiations of the Company's sale and despite Dell's earnings misses.  For instance, analysts at Jyske Bank have had the same price target of $17 per Dell share since May 24, 2012.

89.     Until it approved the Proposed Acquisition, the Board itself also apparently believed the Company was worth in excess of $13.65 per share, as evidenced by the fact that over the last two years, the Company has engaged in a substantial stock buyback program (224 million shares for $3.4 billion), which equates to an average buyback price of $15.25 per share.

90.     The Proposed Consideration equates to just eight times the projected profits of $1.65 per share in Dell's fiscal year ending in January 2014.  When factoring Dell's net cash of

---

[1] "GAAP" means generally accepted accounting principles.

$5 billion, the effective Price-Earnings Ratio is closer to six.  No major company has gone private at such a low multiple to projected profits during the past decade.

91.     Since Dell is undergoing a substantial transformation in its business and analysts expect Dell's current business strategy to grow its normalized earnings per share ("EPS") over the next two fiscal years and deliver even more value to its shareholders, in valuing the Company, emphasis needs to be placed on its forecasted earnings.  A common way to value a public company is by deriving the share price to forecasted normalized EPS multiples of its peer group and then applying that range to the target company's respective financial measure.  A multiple of forecasted normalized EPS can be derived by dividing the actual share price by the forecasted normalized EPS for a given future fiscal year.  Based on a conservative valuation approach, the Company's peers have a trading range of between 10.04x and 14.49x normalized EPS for Fiscal Year 2014.  Using these multiples, the Company should have a per share price range of $16.79 to $24.25 based on forecasted normalized EPS of $1.67 for 2014.  This is at least $3.14, or 23%, more than the Proposed Consideration.

92.     Certain of Dell's largest shareholders recognize that the Proposed Consideration is inadequate and are voicing strong opposition to the Proposed Acquisition.  The largest of these objectors is Southeastern, a $33 billion asset manager that controls approximately 8.4% of Dell's shares.  On February 8, 2013, Southeastern posted a letter addressed to the Board on its website.  A copy of the letter was also filed with the SEC.  The letter protests the proposed buyout price of $13.65 per share, stating that the Proposed Consideration "grossly undervalues the [C]ompany."  Southeastern's letter further states that the true value of the Company that shareholders should receive is closer to $24 a share, calling the Proposed Acquisition "an effort to acquire Dell at a substantial discount to intrinsic value at the expense of public shareholders."  Southeastern has

hired D.F. King & Co., a proxy solicitation firm, to help it fight the undervalued Proposed Acquisition.

93.     On April 9, 2013, Southeastern released the above-quoted open letter it sent to the Special Committee, in which it stated that the Proxy "fails to make a case for shareholders to accept" the Proposed Acquisition.   Moreover, Southeastern discussed how the Special Committee gave limited consideration to other strategic alternatives for the Company's future that would have benefitted shareholders.

94.     A number of other major Dell shareholders, including T. Rowe, a Baltimore mutual funds group and Dell's second largest outside investor, Pzena Investment Management LLC, and Yacktman Asset Management LP, joined Southeastern in publicly objecting to the Proposed Acquisition.  T. Rowe's Chief Investment Officer, Brian Rogers, was quoted as stating, "We believe the proposed buyout does not reflect the value of Dell, and we do not intend to support the offer as put forward."  In all, approximately 23% of Dell shareholders (excluding defendant M. Dell's shares) have publicly expressed their opposition to the Proposed Acquisition.

95.     As seen above, the consideration offered in the Proposed Acquisition does not reflect the true inherent value of the Company that was known only to defendants, as officers and/or directors of Dell at the time the Proposed Acquisition was announced.  Moreover, given the above financial metrics, it is telling that the most knowledgeable investor in Dell, defendant M. Dell, plans to roll his equity in the Company into the post-Proposed Acquisition private company, while limiting any outside investment.  Indeed, defendant Silver Lake is expected to contribute only $1 billion in cash toward the transaction, amounting to less than 5% of the value of the Proposed Acquisition.

**DEFENDANT M. DELL AND OTHER INSIDERS WILL RECEIVE SIGNIFICANT
BENEFITS NOT SHARED BY THE COMPANY'S ORDINARY SHAREHOLDERS**

96.     Whereas the Proposed Acquisition divests the Company's public shareholders of
their equity interest in Dell, defendant M. Dell alone will be rolling over his equity interest in
Dell into the new company.  Indeed, defendant M. Dell will acquire a controlling stake (an
approximately 71.6% equity interest) in the post-closing company despite only personally
contributing a small fraction of the amount needed to complete the Proposed Acquisition.  The
Proxy reflects that defendant M. Dell will be primarily funding the buyout amount through debt
financings (up to approximately $13.75 billion) and the Company's cash reserves (currently at
more than $10 billion) while contributing only $500 million or less of his own cash and his
current 15.6% equity interest in the Company (which is valued at approximately $3.7 billion) in
the deal.

97.     In addition to keeping his position of power and equity in the going-forward
company, it is rumored that defendant M. Dell is planning to take advantage of the Company's
substantial cash reserves.  Specifically, certain financial commentators familiar with the matter
and the parties involved suggest that defendant M. Dell will pay himself a large one-time
dividend after the completion of the Proposed Acquisition with the $5 billion the Company
currently holds in cash.  This would allow defendant M. Dell to recoup a majority of his
investment in taking the Company private in the first place.

98.     The proposed sale is wrongful, unfair, and harmful to Dell's public stockholders,
and represents an effort by defendants to aggrandize their own financial positions and interests at
the expense of and to the detriment of Class members.  Specifically, defendants are attempting to
deny plaintiffs and the Class their shareholder rights via the sale of Dell on terms that do not
adequately value the Company and defendants have failed to disclose all material information

concerning the Proposed Acquisition and Dell's current financials.  Accordingly, the Proposed Acquisition will only benefit defendants and to the detriment of Dell's public shareholders.

**THE MATERIALLY MISLEADING PROXY**

99.    In order to secure shareholder approval of this unfair deal, defendants filed with the SEC the Proxy and Transaction Statement on March 29, 2013 and revised and  amended on May 2, 10, 13, and 20, 2013.  The Proxy and Transaction Statement misrepresent and/or omit material information necessary for Dell's public shareholders to make an informed decision regarding whether to vote in favor of the Proposed Acquisition or seek appraisal of their shares in violation of sections 14a and 20a of the Exchange Act.  Specifically, as set forth below, defendants fail to provide the Company's shareholders with material information and/or provide them with materially misleading information concerning: (i) the process leading to the Proposed Acquisition; (ii) financial analyses performed by J.P. Morgan and Evercore; and (iii) BCG's and the Company's financial projections.

**The Sales Process Leading to the Proposed Acquisition**

100.    With respect to the process that led to the Proposed Acquisition, the Proxy and the Transaction Statement are materially deficient and misleading because they fail to disclose:

(a)    the efforts taken by defendant M. Dell to pursue a going private transaction including, but not limited to, talks between defendant M. Dell and either the Board or potential financing partners or due diligence efforts, for the two years prior to June 2012, and the reasons the parties ultimately decided not to complete such a transaction during that timeframe;

(b)    whether the Board considered implementing the M. Dell Restructuring Plan, the reasons it declined to implement this plan, and any financial analyses conducted in connection therewith; and

- 43 -

(c)     the amount of defendant M. Dell's investment (either personally or through any affiliated entities including, but not limited to, MSD Capital) in defendant Silver Lake and its affiliated funds.

101.    The omission of this information makes the following statements in the Proxy and the Transaction Statement materially misleading:

(a)     On page 20 of the Proxy, the statement:

The Board regularly evaluates the Company's business and operations as well as the Company's competitive position, strategic prospects and direction.

On June 15, 2012, a representative of Southeastern Asset Management, Inc. ("Southeastern"), a stockholder of the Company, which has disclosed that it owns approximately 146.5 million shares of Common Stock, contacted Michael S. Dell, the Company's founder and Chief Executive Officer, to suggest the possibility of a going private transaction involving the Company and to express Southeastern's interest in participating in such a transaction by rolling over a portion of its shares of the Company. The representative of Southeastern also sent Mr. Dell a spreadsheet outlining such a transaction. Mr. Dell responded that he would think about the idea. The representative of Southeastern supplied Mr. Dell with additional information over the next few weeks in response to questions posed by Mr. Dell.

On July 17, 2012, Mr. Dell met a representative of Silver Lake Partners ("Silver Lake") at an industry conference, and the representative of Silver Lake suggested that they arrange a meeting in August to discuss the Company. Mr. Dell and the representative of Silver Lake met on August 10 and 14, 2012. During these meetings, the representative of Silver Lake asked Mr. Dell to consider working with Silver Lake to take the Company private. Mr. Dell said that he would be interested in exploring the idea.

On August 14, 2012, Mr. Dell told Alex J. Mandl, the Company's lead independent director, that Mr. Dell was interested in exploring the possibility of a transaction to take the Company private. Mr. Dell reported to Mr. Mandl the preliminary conversations and meetings he had had with the representatives of each of Southeastern, Silver Lake and Sponsor A. Mr. Dell informed Mr. Mandl that he had made no decision regarding whether to pursue such a transaction and that, if he did pursue such a transaction, he would be willing to consider partnering with any party that offered the best transaction for the Company's other stockholders.

(b)     On page 31 of the Proxy, the statement:

On December 6, 2012, the Board held an in-person meeting at which ...  Mr. Dell made a presentation to the Board in which he expressed his conviction that a going private transaction was the best course for the Company and its unaffiliated stockholders. He outlined strategic initiatives he would cause the Company to

pursue as a private company, including (i) extending the Company's ESS capabilities through significant investments in research and development and additional acquisitions, (ii) hiring large numbers of additional sales personnel, (iii) expanding in emerging markets and (iv) investing in the PC and tablet business. Mr. Dell stated his belief that such initiatives, if undertaken as a public company, would be poorly received by the stock market because they would reduce near-term profitability, raise operating expenses and capital expenditures, and involve significant risk. Mr. Dell stated his view that a going private transaction was in the best interests of the Company's unaffiliated stockholders because they would receive a portion of the potential upside from these initiatives in the form of a premium for their shares without bearing the risk and uncertainties related to executing such initiatives. Following Mr. Dell's presentation, the Board discussed with Mr. Dell a number of issues, including, among others, the role of Silver Lake in a going private transaction and the reasons Mr. Dell believed the initiatives he outlined could not be readily achieved in a public company setting. Mr. Dell reiterated his belief that implementing such initiatives would require additional investments that could weaken earnings and cause greater volatility in the performance of the Common Stock. Mr. Dell also noted that, in the absence of a transaction, he would be prepared to stay on as Chief Executive Officer and attempt to implement certain of these initiatives despite the increased risks he identified.

(c)     On pages 51-52 of the Proxy, the statement:

• the Special Committee's review, with the assistance of J.P. Morgan, Evercore and BCG, of the nature and current state of, and prospects for, the industries in which the Company operates and the Company's competitive position and prospects within those industries, as well as general economic and stock market conditions, including:

    • fundamental changes in the PC market, including a decline in worldwide revenues for desktop and laptop PCs and lower shipment forecasts for PC products; rapidly declining margins as demand for PC products shifts from higher-margin premium products to lower cost and lower margin products, particularly in emerging markets; significant and increasing competition from efficient, low-cost manufacturers relying primarily on a build-to-stock business model, rather than the build-to-order business model historically used by the Company, and from manufacturers of innovative, higher-margin PC products, which competition could result in reduced profit margins, further loss of market share for the Company's products and services, or both;

    • long-term challenges that are likely to affect PC sales, including a general lengthening of the replacement cycle for PC products, the uncertain adoption of the Windows 8 operating system and unexpected slowdowns in enterprise Windows 7 upgrades, increasing consumer interest in tablets and smartphones, the potential substitution of these products for PC products and the related fact that the Company currently sells tablets only in limited quantities and does not manufacture smartphones;

    • the uncertain outlook for global information technology spending generally and the PC market specifically, and the related challenges for the

Company and other technology companies in accurately forecasting future demand for their products and services; and

• general macroeconomic challenges and economic weakness that could continue to result in reduced consumer and business spending;

• the Special Committee's review, with the assistance of J.P. Morgan, Evercore and BCG, of the Company's business, operations, financial condition, management, earnings, prospects and strategy, including:

• the risks and challenges inherent in executing the Company's long-term business strategy of shifting its portfolio toward products and services that provide higher-value and recurring revenue streams and, as part of this strategy, expanding the Company's ESS business, including, among other matters:

• that, according to the Company's management, executing this strategy would require at least three to five years to reach fruition and would require additional investments that could weaken earnings for two or more years and increase pressure on the Company's stock price;

• the risk that the Company's ability to make such investments would be affected by the negative trends in its EUC business, the cash flow from which has historically financed the growth of the Company's ESS business, as well as the EUC business' need for substantial cash resources to transition to a build-to-stock business model from the Company's historical build-to-order business model; and

• the Company's slow progress to date in implementing changes needed to execute this strategy and the Special Committee's uncertainty as to the Company's ability to fully execute this strategy in light of this slow progress and the slow growth to date of the Company's ESS business; the Company's underperformance in various segments of its ESS business relative to the performance of the Company's competitors; the fact that, in connection with this strategy, the Company had used approximately $11.4 billion of its cash resources over the past four years to fund acquisitions since the beginning of fiscal year 2010, which BCG advised the Special Committee had thus far yielded lower returns relative to their expected returns; and the fact that, in spite of such acquisitions, the Company's EUC and EUC-driven business remained the source of approximately 65% of the Company's revenue as of January 2013;

(d)     On pages 53-54 of the Proxy, the statement:

• the Special Committee's review, with the assistance of J.P. Morgan, Evercore and BCG, of the strategic alternatives available to the Company, including seeking to continue to execute the Company's existing business plan; modifications to the Company's existing business plan, including those intended to pursue lower-margin segments of the PC business; effecting a leveraged recapitalization or change in dividend policy; seeking to separate the Company's

EUC business from its other businesses; seeking to dispose of DFS, the Company's financial services business; attempting to accelerate the Company's strategic transformation through acquisitions; and a sale to, or merger with, a strategic buyer, as well as, for each of these alternatives, such alternative's risks and uncertainties, potential for value creation, likelihood of successful execution, potential for disruption to the Company's business, and likely timetable, including the following factors:

• its belief that pursuing certain modifications to the Company's existing business plan may result in short-term decreases in earnings that would negatively affect the Company's stock price, which could in turn decrease customer confidence in the Company's long-term prospects and undermine customers' willingness to make multi-year commitments to the Company's service offerings;

• its belief that a standalone leveraged recapitalization, while providing certainty of value for a portion of stockholders' investment in the Company, would increase the risk inherent in stockholders' remaining investment in the Company, even when taking into account the certain value distributed to stockholders, would be unlikely to result in an aggregate value exceeding the $13.65 per share merger consideration; and would present a number of risks and challenges, including that such a transaction would:

• increase the Company's leverage ratios, which in light of the Company remaining a public reporting company could in turn potentially decrease employee, customer and supplier confidence in the Company's long-term prospects and undermine customers' and suppliers' willingness to make multi-year commitments to the Company;

• present financial and operating risks and challenges associated with the substantial increase in the Company's leverage, including subjecting the Company to potentially onerous debt service requirements and financial and restrictive covenants, as well as potentially limiting the Company's ability to aggressively implement its long-term business strategy described above, which could prolong the Company's dependence on its EUC business; and

• impair the ability of DFS, the Company's financial services business, to raise external financing in a credit market environment that continues to be volatile on terms that would allow it to provide financing on competitive terms to customers;

• the complexity, execution risk and transaction costs that would likely be involved in separating the Company's EUC business from the Company's ESS business, including the need to reorganize the sales force and divide senior management across the two businesses; the potential negative effect on customer and vendor relationships; reduced opportunities for cross-selling products and services; the dissynergies that such a separation would likely create, including increased operating expenses; the fact that, following such a separation, cash generated by the Company's EUC business would no longer be available to finance the growth of its ESS

business; and the significant length of time that might be required to complete the separation, and the potential disruption to, and potential adverse impact on, the Company's business while the transaction was in progress;

• the complexity, execution risk and transaction costs that would likely be involved in a disposition of DFS, and the Special Committee's belief that such a transaction was unlikely to create sufficient value for the Company's stockholders to offset potential disadvantages, such as additional costs required to replace the Company's captive financing services with third-party financing services, reduced flexibility to integrate financing services and product offerings and the negative effect on customer experience as a result of not having an integrated sales and financing team; and

• its belief that prospects for transformative acquisitions in the short term were limited by the number of potential targets at reasonable valuations, the potential negative market reaction to such acquisitions and the Company's need to focus its efforts on integrating recently acquired targets;

    (e)      On page 112 of the Proxy, the statement:

In considering the recommendation of the Board (without Mr. Dell's participation) that you vote to approve the proposal to adopt the merger agreement, you should be aware that, aside from their interests as stockholders of the Company, the Company's directors and executive officers have interests in the merger that are different from, or in addition to, interests of other stockholders of the Company generally. In particular, as is described elsewhere in this proxy statement, Mr. Dell, who is Chairman of the Board and Chief Executive Officer of the Company, is a director, officer and stockholder of Parent and will be a controlling stockholder of Parent after completion of the merger.

    102.    These statements are rendered misleading by the omissions because they give a materially incomplete and distorted picture of the sales process, and in particular the history of defendant M. Dell's interest and efforts in taking the Company private, whether, and to what extent, the Special Committee and Board considered and explored all potential strategic alternatives to the Company (including the M. Dell Restructuring Plan), and the full extent of defendant M. Dell's financial interest in the Proposed Acquisition.

**J.P. Morgan's Financial Analyses**

    103.    **J.P. Morgan's Public Trading Multiples Analysis.**  The description of J.P. Morgan's Public Trading Multiples Analysis on pages 64-67 of the Proxy and other information

disclosed about this analysis in the Transaction Statement are materially deficient and misleading because they fail to disclose:

(a)  the basis of the Fiscal Year 14E EV/EBITDA and P/E multiple ranges of 3.5-5.5x and 5.0-10.0x (the "Reference Ranges") used in this analysis, as referenced on page 61 of the Proxy.  According to the pages 65-67 of the Proxy, J.P. Morgan calculated these Reference Ranges based on the CY13E EV/EBITDA, Cash Adjusted EV/EBITDA, and P/E multiples of selected companies, which are disclosed on page 60 of the Proxy (in summary form) and in the Transaction Statement.  However, the valuation multiples of the selected companies that are disclosed in the Proxy and the Transaction Statement do not correspond at all to the above Reference Ranges that were actually used in the analysis, meaning that some other source of information must have been used for the valuation multiples used in the analysis;

(b)  the specific cost adjustments used to calculate the 2013 calendar year Cash Adjusted Enterprise Value for the selected companies; and

(c)  the definition of "friction cost," as used in the analysis, and the basis of the calculated friction cost of 35% used in the analysis.

104.  The omission of this information renders the following statements in the Proxy materially misleading:

(a)  on page 62, the statement:

At the meeting of the Board on February 4, 2013, J.P. Morgan rendered its oral opinion to the Board and the Special Committee that, as of such date and based upon and subject to the factors and assumptions set forth in such opinion, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. J.P. Morgan confirmed its February 4, 2013 oral opinion by delivering its written opinion to the Board and the Special Committee, dated as of the same date, that, as of such date, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and

dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. No limitations were imposed by the Board or the Special Committee upon J.P. Morgan with respect to the investigations made or procedures followed by it in rendering its opinion.

(b)    on pages 64-67, the statement:

Using publicly available information, J.P. Morgan compared selected financial data of the Company with similar data for selected publicly traded companies engaged in businesses which J.P. Morgan judged to be comparable to the Company's businesses or aspects thereof. The companies selected by J.P. Morgan were:

|  |  |
|---|---|
|  | • Hewlett-Packard Corporation |
| *End-User Computing* | • ASUSTEK Computer Inc. |
| *("EUC")* | • Lenovo Group |
|  | • Acer Incorporated |
| *Software & Peripherals* | • Insight Enterprises, Inc. |
| *("S&P")* | • Avnet, Inc. |
|  | • TechData Corp |
|  | • Ingram Micro Inc. |
| *Enterprise* | • Microsoft Corporation |
|  | • EMC Corporation |
|  | • NetApp Inc. |
|  | • Oracle Corporation |
|  | • Cisco Systems, Inc. |
|  | • International Business Machines Corp. |
| *Services* | • Wipro Limited |
|  | • Xerox Corporation |
|  | • Computer Sciences Corporation |
| *Software* | • *BMC Software, Inc.* |
|  | • Symantec Corporation |
|  | • CA, Inc. |

These companies were selected, among other reasons, because of similarities to the Company in one or more of their business, regional or end-market characteristics and, in certain cases, similarities to the Company based on operational characteristics and financial metrics. However, none of the companies selected is identical or directly comparable to the Company, and certain of the companies may have characteristics that are materially different from those of the Company. Accordingly, J.P. Morgan made judgments and assumptions concerning differences in financial and operating characteristics of the selected companies and other factors that could affect the public trading value of the selected companies.

For each selected company and the Company, J.P. Morgan calculated such company's expected earnings before interest, taxes, depreciation and amortization

("EBITDA") for the 2013 calendar year ("CY13E") (provided that, for the Company, expected EBITDA for its fiscal year ending January 31, 2014 was used as an approximation for calendar year). J.P. Morgan then divided each such company's Enterprise Value (as defined below) by its expected EBITDA for CY13E ("CY13E EV/EBITDA") and divided each such company's Cash Adjusted Enterprise Value (as defined below) by its expected EBITDA for CY13E ("CY13E Cash Adjusted EV/EBITDA"). For the Company, Hewlett-Packard Corporation, the EUC companies and the Enterprise companies, J.P. Morgan also calculated on a rolling basis beginning in February 2010 each such company's Enterprise Value divided by expected EBITDA for the next twelve months ("NTM EV/EBITDA"). For purposes of this analysis, a company's "Enterprise Value" was calculated as the fully diluted common equity value of such company plus the value of such company's indebtedness and minority interests and preferred stock, minus such company's cash, cash equivalents and short-term and long-term liquid investments and its " Cash Adjusted Enterprise Value" was calculated as its Enterprise Value as adjusted for estimated costs associated with the repatriation of foreign cash, assuming a friction cost of 35%.

\* \* \*

The following table represents the results of J.P. Morgan's analysis of the CY13E EV/EBITDA, CY13E Cash Adjusted EV/EBITDA and CY13E P/E multiples of the above-identified comparable publicly traded companies as of February 1, 2013 compared to the Company's analogous trading multiples as of January 11, 2013, the last trading day before media reports of a possible going private transaction involving the Company were first published:

| | Company | HP | EUC | | S&P(1) | | Enterprise | | Services | | Software | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Range | Median | Range | Median | Range | Median | Range | Median | Range | Median |
| CY13E EV/EBITDA | 3.3x | 3.7x | 6.0x–7.8x | 6.9x | 4.2x–6.5x | 4.8x | 5.4x–9.0x | 8.4x | 4.1x–10.1x | 5.5x | 5.4x–7.6x | 6.5x |
| CY13E Cash Adjusted EV/EBITDA | 4.3x | 4.0x | 6.0x–7.8x | 6.9x | 4.4x–6.5x | 5.0x | 5.6x–9.6x | 8.9x | 4.3x–10.1x | 5.5x | 5.6x–7.8x | 6.9x |
| CY13E P/E | 6.6x | 4.9x | 11.0x–25.0x | 15.5x | 7.7x–9.5x | 9.0x | 9.3x–20.5x | 12.5x | 7.2x–15.9x | 14.3x | 10.9x–13.7x | 13.3x |

(1) S&P refers to Software & Peripherals.

The following table represents the results of J.P. Morgan's analysis of the NTM EV/EBITDA and NTM P/E multiples of comparable publicly traded companies and, with respect to NTM/PE only, for the S&P 500 as of February 1, 2013, November 30, 2012 and their one-, two- and three-year averages, compared to the Company's trading multiples as of January 11, 2013, the last trading day before media reports of a possible going private transaction involving the Company were first published, and as of November 30, 2012, the last trading day before an analyst report was issued by Goldman Sachs suggesting that the Company might be a target for a leverage buyout transaction and its one-, two- and three-year averages (except with respect to the foregoing for the S&P 500 which is according to FactSet):

| | Company | | HP | | EUC | | Enterprise | | S&P 500 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | NTM EV/EBITDA | NTM P/E | NTM EV/EBITDA | NTM P/E | NTM EV/EBITDA | NTM P/E | NTM EV/EBITDA | NTM P/E | NTM P/E(1) |
| Current(2) | 3.3x | 6.6x | 3.7x | 4.9x | 7.4x | 12.2x | 6.7x | 12.0x | 13.0x |
| Pre-GS Report | 2.7x | 5.8x | 3.2x | 3.8x | 6.6x | 11.7x | 6.3x | 11.3x | 12.1x |
| 1-year average | 3.4x | 6.6x | 3.9x | 4.9x | 6.0x | 11.4x | 6.7x | 11.9x | 12.6x |
| 2-year average | 3.6x | 7.4x | 4.1x | 5.8x | 6.3x | 11.1x | 7.1x | 12.5x | 12.3x |
| 3-year average | 3.9x | 8.4x | 4.7x | 7.0x | 6.5x | 11.2x | 7.6x | 13.2x | 12.6x |

(1) According to Factset.
(2) As of February 1, 2013, except for Dell as of January 11, 2013.

For purposes of its analysis of each of the Company and the selected companies in the tables above, J.P. Morgan used estimates for EBITDA and earnings per share based on consensus analyst research estimates, and based on publicly available financial data, including Wall Street research estimates and FactSet, and, as appropriate, further adjusted to include stock-based compensation expense but exclude non-recurring items.

J.P. Morgan then calculated the Company's equity value per share implied by certain reference ranges of multiples, which were selected by J.P. Morgan based on the multiples calculated for comparable companies, under various projections of EBITDA and earnings per share for the Company for the Company's fiscal year 2014. In calculating the implied equity value per share for the Company, J.P. Morgan reviewed five different cases, two of which, the Preliminary FY14 Internal Plan and the Preliminary FY14 Board Case (each as defined below), were prepared by the Company's management and three of which, the BCG Base Case, the BCG 25% Case and the BCG 75% Case (each as defined below), were prepared by BCG. Each of these cases is discussed in more detail under "—Background of the Merger" beginning on page 19 and "—Projected Financial Information" beginning on page 86.

A summary of the implied valuation ranges of the Common Stock that J.P. Morgan derived based on the ratio of Enterprise Value to estimated EBITDA under each of the five cases, using a reference range of 3.5x to 5.5x, is set forth below:

| Case | Implied Valuation Range |
|---|---|
| Preliminary FY14 Internal Plan | $ 12.00 to $17.25 |
| Preliminary FY14 Board Case | $ 11.25 to $16.00 |
| BCG Base Case | $ 10.50 to $15.00 |
| BCG 25% Case | $ 12.00 to $17.25 |
| BCG 75% Case(1) | $ 15.25 to $22.50 |

(1) Calculated for informational purposes only.

A summary of the implied valuation ranges of the Common Stock that J.P. Morgan derived based on the ratio of price per share to expected earnings per share under each of the five cases, using a reference range of 5.0x to 10.0x, is set forth below:

| Case | Implied Valuation Range |
|---|---|
| Preliminary FY14 Internal Plan | $ 8.75 to $17.50 |
| Preliminary FY14 Board Case | $ 8.00 to $16.00 |
| BCG Base Case | $ 7.25 to $14.50 |
| BCG 25% Case | $ 9.00 to $18.00 |
| BCG 75% Case(1) | $ 13.00 to $26.00 |

(1) Calculated for informational purposes only.

All values presented were rounded to the nearest $0.25. In each case, J.P. Morgan compared the implied equity values per share to (i) the merger consideration of $13.65 per share in cash to be paid to holders of the Common Stock in the merger,

noting that the merger consideration is within each of the implied valuation ranges other than the one based on the ratio of Enterprise Value to estimated EBITDA in the BCG 75% Case (which range was calculated for informational purposes only), (ii) the $10.88 per share closing price of the Common Stock as of January 11, 2013, the last trading day before media reports of a possible going private transaction involving the Company were first published, (iii) the $13.63 per share closing price of the Common Stock as of February 1, 2013 and (iv) the $9.64 per share closing price of the Common Stock as of November 30, 2012, the last trading day before an analyst report was issued by Goldman Sachs suggesting that the Company might be a target for a leverage buyout transaction.

105.   **J.P. Morgan's Discounted Cash Flow Analysis**.   The description of J.P. Morgan's Discounted Cash Flow Analysis on pages 67-68 in the Proxy and other information disclosed about this analysis in the Transaction Statement are materially deficient because they fails to disclose:

(a)   the specific inputs and assumptions (including but not limited to the risk-free rate, the beta range, the equity risk premium, any other premiums used, the Company's pre-tax cost of debt and tax rate, and the assumed capital structure) used to derive the range of discount rates (9.5%-13.5%) used in the analysis. This information is particularly material because J.P. Morgan used a lower discount rate range of 9%-11% in its earlier presentations to the Board and Special Committee and then raised its discount range to 9.5%-13.5% for its final presentation, which drove down the resulting value range for the Company.  Nowhere in the Proxy or the Transaction Statement do defendants disclose the basis for this change.

(b)   the basis for using an EBITDA terminal value of 3.5x-5.5x that does not take into account potential growth to be achieved under Dell management's restructuring plan (and projected under the BCG 75% Case and September 21 Case);

(c)   how stock-based compensation was treated in the analysis (i.e., as a cash or non-cash expense); and

(d)     The reasons why J.P. Morgan relied upon the BCG Base Case and BCG 25% Case projections, and disregarded the BCG 75% Case and September 21 Case, for purposes of this analysis.

106.    The omission of this information renders the following statements in the Proxy materially misleading:

(a)     on page 62, the statement:

At the meeting of the Board on February 4, 2013, J.P. Morgan rendered its oral opinion to the Board and the Special Committee that, as of such date and based upon and subject to the factors and assumptions set forth in such opinion, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. J.P. Morgan confirmed its February 4, 2013 oral opinion by delivering its written opinion to the Board and the Special Committee, dated as of the same date, that, as of such date, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. No limitations were imposed by the Board or the Special Committee upon J.P. Morgan with respect to the investigations made or procedures followed by it in rendering its opinion.

(b)     on pages 67-68, the statement:

J.P. Morgan also calculated a range of terminal asset values of the Company by applying an EV/EBITDA multiple ranging from 3.5x to 5.5x of the EBITDA of the Company as estimated for the terminal period. The unlevered free cash flows and the range of terminal asset values were then discounted to present values using a range of discount rates from 9.5% to 13.5%, which were chosen by J.P. Morgan based upon an analysis of the weighted average cost of capital of the Company and the selected companies identified above.

*   *   *

A summary of the implied valuation ranges of the Common Stock that J.P. Morgan derived from such analyses is set forth below. As noted above, J.P. Morgan's analysis took into account its discussions with the Special Committee, management and BCG, including the factors and circumstances discussed with the Special Committee surrounding the forecasts and analyses prepared by BCG and management. Taking into account the actual performance of the Company, the condition of the markets in which it is active and such discussions, the ranges with respect to the September 21 Case and the BCG 75% Case were calculated for informational purposes only, and J.P. Morgan gave no weight to the September 21 Case and the BCG 75% Case in its discounted cash flow analysis.

| Case | Implied Valuation Range |
|---|---|
| BCG Base Case | $ 10.50 to $14.25 |
| BCG 25% Case | $ 12.00 to $16.50 |
| BCG 75% Case(1) | $ 15.00 to $21.25 |
| September 21 Case(1) | $ 15.50 to $21.75 |

(1) Calculated for informational purposes only.

All values presented were rounded to the nearest $0.25. In each case, J.P. Morgan compared the implied equity values per share to (i) the merger consideration of $13.65 per share in cash to be paid to holders of the Common Stock in the merger, (ii) the $10.88 per share closing price of the Common Stock as of January 11, 2013, the last trading day before media reports of a possible going private transaction involving the Company were first published, (iii) the $13.63 per share closing price of the Common Stock as of February 1, 2013 and (iv) the $9.64 per share closing price of the Common Stock as of November 30, 2012, the last trading day before an analyst report was issued by Goldman Sachs suggesting that the Company might be a target for a leverage buyout transaction.

107.   **J.P. Morgan's Analyses of Strategic Alternatives**.  Page 21 of J.P. Morgan's Presentation to the Board on January 18, 2013 (which is attached as Exhibit (c)(11) to the Transaction Statement) indicates that J.P. Morgan conducted financial analyses of potential strategic alternatives including, but not limited to, an Enhanced Capital Distribution, but does not disclose the implied values per share for any of these alternative transactions.  It is particularly material for defendants to disclose any valuations prepared in relation to the Enhanced Capital Distribution given that Icahn Enterprises and Southeastern have recently proposed similar transactions to the Board and shareholders need all available information to evaluate which transaction presents greater value for shareholders in deciding whether to approve the Proposed Acquisition.

108.   The omission of this information renders the following statements in the Proxy materially misleading:

(a)   on pages 50-51, the statement:

**Reasons for the Merger; Recommendation of the Board of Directors; Fairness of the Merger**

***Determinations of the Special Committee***

On February 4, 2013, the Special Committee, consisting entirely of independent

and disinterested directors, and acting with the advice of its own independent legal and financial advisors and other experts, unanimously (i) determined that the transactions contemplated by the merger agreement, including the merger, are fair to and in the best interests of the Company's stockholders (other than the MD Investors and the Gift Trusts), (ii) recommended that the Board approve and declare advisable the merger agreement and the transactions contemplated therein, including the merger, and (iii) recommended that the Company's stockholders vote for the adoption of the merger agreement. The Special Committee further believes that the merger is fair to the Company's "unaffiliated security holders," as defined under Rule 13e-3 of the Exchange Act.

In the course of making the determinations described above, the Special Committee considered the following factors relating to the Company, its business and prospects, and the risks and challenges facing it, and to the merger agreement and the transactions contemplated thereby, including the merger (all of which factors tended to support the recommendation and consummation of such agreement and transactions, but which factors are not intended to be exhaustive and are not presented in any relative order of importance):

- the Special Committee's review, with the assistance of J.P. Morgan, Evercore and BCG, of the nature and current state of, and prospects for, the industries in which the Company operates and the Company's competitive position and prospects within those industries, as well as general economic and stock market conditions, including:

  - fundamental changes in the PC market, including a decline in worldwide revenues for desktop and laptop PCs and lower shipment forecasts for PC products; rapidly declining margins as demand for PC products shifts from higher-margin premium products to lower cost and lower margin products, particularly in emerging markets; significant and increasing competition from efficient, low cost manufacturers relying primarily on a build-to-stock business model, rather than the build-to-order business model historically used by the Company, and from manufacturers of innovative, higher-margin PC products, which competition could result in reduced profit margins, further loss of market share for the Company's products and services, or both;

  - long-term challenges that are likely to affect PC sales, including a general lengthening of the replacement cycle for PC products, the uncertain adoption of the Windows 8 operating system and unexpected slowdowns in enterprise Windows 7 upgrades, increasing consumer interest in tablets and smartphones, the potential substitution of these products for PC products and the related fact that the Company currently sells tablets only in limited quantities and does not manufacture smartphones;

  - the uncertain outlook for global information technology spending generally and the PC market specifically, and the related challenges for the Company and other technology companies in accurately forecasting future demand for their products and services; and

• general macroeconomic challenges and economic weakness that could continue to result in reduced consumer and business spending;

• the Special Committee's review, with the assistance of J.P. Morgan, Evercore and BCG, of the Company's business, operations, financial condition, management, earnings, prospects and strategy, including:

• the risks and challenges inherent in executing the Company's long-term business strategy of shifting its portfolio toward products and services that provide higher-value and recurring revenue streams and, as part of this strategy, expanding the Company's ESS business, including, among other matters:

• that, according to the Company's management, executing this strategy would require at least three to five years to reach fruition and would require additional investments that could weaken earnings for two or more years and increase pressure on the Company's stock price;

(b)  on page 62, the statement:

At the meeting of the Board on February 4, 2013, J.P. Morgan rendered its oral opinion to the Board and the Special Committee that, as of such date and based upon and subject to the factors and assumptions set forth in such opinion, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. J.P. Morgan confirmed its February 4, 2013 oral opinion by delivering its written opinion to the Board and the Special Committee, dated as of the same date, that, as of such date, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. No limitations were imposed by the Board or the Special Committee upon J.P. Morgan with respect to the investigations made or procedures followed by it in rendering its opinion.

**Evercore's Financial Analyses**

109.   **Evercore's Trading Multiples Analysis.**  The description of Evercore's Trading Multiples Analysis on pages 73-75 of the Proxy and other information disclosed about this analysis in the Transaction Statement are materially deficient and misleading because they fail to disclose:

(a)     the basis of the EV/EBITDA, MEV/NI, and MEV/FCF Reference Ranges used in this analysis, as referenced on page 73 of the Proxy.  According to pages 73-75 of the Proxy, J.P. Morgan calculated these Reference Ranges based on the valuation multiples of Hewlett Packard ("HP") and a peer trading group, which are disclosed on page 68 of the Proxy (in summary form) and in the Transaction Statement.  However, the valuation multiples of the selected companies that are disclosed in the Proxy and the Transaction Statement do not correspond at all to the above Reference Ranges that were actually used in the analysis, meaning that some other source of information must have been used for the valuation multiples used in the analysis; and

(b)     the basis of Evercore's conclusion that HP represented the only company sufficiently comparable to Dell.

110.    The omission of this information renders the following statements in the Proxy materially misleading:

(a)     on page 69, the statement:

Pursuant to an engagement letter dated January 10, 2013, the Special Committee retained Evercore to act as financial advisor to the Special Committee. On February 4, 2013, at meetings of the Special Committee and the Board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion later that day, that, as of February 4, 2013, and based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in its opinion, the $13.65 per share merger consideration was fair, from a financial point of view, to the holders of the shares of Common Stock entitled to receive such merger consideration.

(b)     on pages 73-75, the statement:

For purposes of its analysis, Evercore calculated (i) the historical forward EV/EBITDA, MEV/NI and MEV/FCF multiples of the Company for the five years prior to January 11, 2013, utilizing the closing price per share set of the Common Stock on each historical day and research estimates as of that date for the projected EBITDA, net income and free cash flow for the next twelve months, (ii) the historical forward EV/EBITDA, MEV/NI and MEV/FCF multiples of Hewlett Packard ("HP") (which Evercore deemed, based on its professional judgment and experience, the only company sufficiently comparable to the Company for purposes of this analysis) for the five years prior to January 11,

2013, utilizing the closing price per share of HP's common stock on each historical day and research estimates as of that date for the projected EBITDA, net income and free cash flow for the next twelve months, (iii) the current forward EV/EBITDA, MEV/NI and MEV/FCF multiples of the Company utilizing the closing price per share of the Common Stock on January 11, 2013 and estimates for EBITDA, net income and free cash flow under each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case, (iv) the current forward EV/EBITDA, MEV/NI and MEV/FCF multiples of HP utilizing the closing price per share of HP's common stock on February 1, 2013 and publicly available research estimates for calendar year 2013 ("CY2013") EBITDA, CY2013 net income and CY2013 free cash flow of HP, and (v) the current forward EV/EBITDA, MEV/NI and MEV/FCF multiples of the Company's peer trading group, which group was divided into the Company's (1) personal computer peers including Acer, ASUSTeK Computer, Lenovo, Toshiba, Apple, Samsung and Fujitsu (such peer group collectively, "PC Heavy"), (2) enterprise focused peers including IBM, Oracle, EMC, NetApp, Cisco Systems and CSC (such peer group collectively, "Enterprise Heavy") and (3) other peers including Ricoh, Xerox, Seiko Epson, Canon, Tech Data Corp and Lexmark (such peer group collectively, "Other") utilizing the closing price per share of each comparable company's common stock on February 1, 2013 and publicly available research estimates for CY2013 EBITDA, CY2013 net income and CY2013 free cash flow of each comparable company. The analyses resulted in the following multiples:

| Trading Multiples | EV/EBITDA | MEV/NI | MEV/FCF |
|---|---|---|---|
| **Company:** | | | |
| Current: | | | |
| September 21 Case | 2.8x | 6.0x | 6.0x |
| BCG Base Case | 3.4x | 7.6x | 8.2x |
| BCG Productivity Case | 3.3x | 7.4x | 8.0x |
| Street Median Case | 3.2x | 7.0x | 9.3x |
| 5-Year High | 9.4x | 14.9x | 13.6x |
| 5-Year Low | 2.0x | 5.5x | 4.9x |
| 5-Year Average | 4.4x | 9.9x | 8.1x |
| **HP:** | | | |
| Current | 3.7x | 4.9x | 6.8x |
| 5-Year High | 9.4x | 13.7x | 13.2x |
| 5-Year Low | 2.9x | 3.8x | 4.9x |
| 5-Year Average | 5.6x | 8.7x | 8.6x |
| **Current Peer Trading Group Multiples** | | | |
| **PC Heavy Peers:** | | | |
| High | 8.1x | 23.9x | 18.2x |
| Low | 3.3x | 8.4x | 9.1x |
| Median | 5.4x | 11.6x | 11.0x |
| **Enterprise Heavy Peers:** | | | |
| High | 8.7x | 16.7x | 13.7x |
| Low | 4.1x | 10.3x | 8.0x |
| Median | 7.1x | 13.3x | 11.1x |
| **Other:** | | | |
| High | 7.2x | 14.0x | 19.9x |
| Low | 2.2x | 6.3x | 5.7x |
| Median | 4.9x | 8.9x | 12.9x |

Based on the results of this analysis and Evercore's professional judgment and experience, Evercore selected (1) an EV/EBITDA multiple reference range of 3.0x to 5.0x, (2) a MEV/NI multiple reference range of 6.0x to 10.0x and (3) a MEV/FCF multiple reference range of 6.0x to 10.0x. Evercore then applied such reference ranges to the Company's estimated fiscal year 2014 EBITDA, net income and free cash flow, respectively, for each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case. Based on this analysis, Evercore derived the following range of implied equity values per share for the Company.

| Estimated FY2014 EBITDA | Implied Equity Value Range Per Share |
|---|---|
| September 21 Case | $11.52—$16.99 |
| BCG Base Case | $10.09—$14.62 |
| BCG Productivity Case | $10.24—$15.34 |
| Street Median Case | $10.42—$15.16 |

| Estimated FY2014 Net Income | Implied Equity Value Range Per Share |
|---|---|
| September 21 Case | $10.87—$18.08 |
| BCG Base Case | $8.61—$14.35 |
| BCG Productivity Case | $8.84—$15.48 |
| Street Median Case | $9.34—$15.55 |

| Estimated FY2014 Free Cash Flow | Implied Equity Value Range Per Share |
|---|---|
| September 21 Case | $10.92—$18.16 |
| BCG Base Case | $7.99—$13.31 |
| BCG Productivity Case | $8.20—$14.35 |
| Street Median Case | $7.01—$11.68 |

Evercore compared the results of this analysis to the $13.65 per share merger consideration to be received by the holders of Company common stock entitled to receive such consideration pursuant to the merger agreement, noting that the merger consideration is above two of the implied valuation ranges and within each of the other implied valuation ranges.

111.   **Evercore's Present Value of Future Stock Price Analysis.**  The description of Evercore's Present Value of Future Stock Price Analysis on page 75 of the Proxy and other information disclosed about this analysis in the Transaction Statement are materially deficient because they omit:

(a)   the specific inputs and assumptions used to derive the discount rates (12%-13%) used in the analysis.  This information is particularly material given that that this discount rate appears to be inconsistent with the discount rate range used in the Discounted Cash Flow analysis (i.e., the two set of rates imply different returns on debt and/or debt/equity ratio assumptions); and

(b)   the estimated diluted share count provided by Dell management and relied upon by Evercore in this analysis.

112.   The omission of this information renders the following statements in the Proxy materially misleading:

   (a)  on page 69, the statement:

Pursuant to an engagement letter dated January 10, 2013, the Special Committee retained Evercore to act as financial advisor to the Special Committee. On February 4, 2013, at meetings of the Special Committee and the Board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion later that day, that, as of February 4, 2013, and based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in its opinion, the $13.65 per share merger consideration was fair, from a financial point of view, to the holders of the shares of Common Stock entitled to receive such merger consideration.

   (b)  on page 75, the statement:

Evercore calculated illustrative future stock prices for the Company's common stock on January 31, 2015 by applying (i) a range of forward EV/EBITDA multiples of 3.0x to 5.0x to estimated EBITDA of the Company for fiscal year 2016 ("FY2016") and adjusted the resulting enterprise value by estimated net debt of the Company as of January 31, 2015 , (ii) a range of forward MEV/NI multiples of 6.0x to 10.0x to estimated net income of the Company for FY2016 and (iii) a range of forward MEV/FCF multiples of 6.0x to 10.0x to estimated free cash flow of the Company for FY2016. The forward EV/EBITDA, MEV/NI multiples and MEV/FCF multiples were based on the multiple ranges used in the Trading Multiples Analysis described above. Evercore then applied such reference ranges to the Company's estimated FY2016 EBITDA, net income and free cash flow, respectively, for each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case.

The illustrative future market equity values for the Company on January 31, 2015, were then discounted back to January 31, 2013, using an equity discount range of 12.0% to 13.0% (which was based on Evercore's professional judgment and experience, taking into account the Company's cost of equity derived using the capital asset pricing model) and divided by the estimated diluted share count as of January 31, 2013 as provided by Company management. Based on this analysis, Evercore derived the following range of implied equity values per share for the Company:

| Estimated FY2016 Net Income | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $14.05—$21.60 |
| BCG Base Case | $9.11—$13.59 |
| BCG Productivity Case | $11.06—$23.11 |
| Street Median Case | $10.08—$15.04 |

| Estimated FY2016 FCF | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $14.31—$22.04 |
| BCG Base Case | $9.04—$13.48 |
| BCG Productivity Case | $10.92—$22.63 |
| Street Median Case | $8.20—$11.86 |

| Estimated FY2016 EBITDA | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $13.08—$18.64 |
| BCG Base Case | $9.54—$13.15 |
| BCG Productivity Case | $10.83—$19.37 |
| Street Median Case | $10.84—$14.56 |

Evercore compared the results of this analysis to the $13.65 per share merger consideration to be received by the holders of Company common stock entitled to receive such consideration pursuant to the merger agreement, noting that the merger consideration is above four of the implied valuation ranges, below two of the implied valuation ranges and within all of the other implied valuation ranges.

113.   **Evercore's Premiums Paid Analysis.**  The description of Evercore's Premiums Paid Analysis on pages 76-78 of the Proxy and other information disclosed about this analysis in the Transaction Statement are materially deficient because they omit:

(a)   whether Evercore conducted a Premiums Paid Analysis based on any other relevant parameters, such as the premiums paid in management-led buyout transactions, and if so, the results of any such analysis; and

(b)   whether the analysis accounts for differences in the financial health of the market (i.e., depressed v. boom  market).

114.   The omission of this information renders the following statements in the Proxy materially misleading:

(a)   on page 69, the statement:

Pursuant to an engagement letter dated January 10, 2013, the Special Committee retained Evercore to act as financial advisor to the Special Committee. On February 4, 2013, at meetings of the Special Committee and the Board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion

later that day, that, as of February 4, 2013, and based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in its opinion, the $13.65 per share merger consideration was fair, from a financial point of view, to the holders of the shares of Common Stock entitled to receive such merger consideration.

(b)      on pages 76-78, the statement:

Evercore reviewed the premiums paid for (i) all closed global transactions from January 1, 2002 through January 5, 2013 with enterprise values greater than $10.0 billion ("global transactions"), of which there were 126, (ii) global transactions with cash consideration only ("cash transactions") from January 1, 2002 through January 5, 2013, of which there were 50, (iii) global transactions involving strategic buyers ("strategic transactions"), from January 1, 2002 through January 5, 2013, of which there were 103, and (iv) global transactions involving financial sponsor buyers ("sponsor transactions") from January 1, 2002 through January 5, 2013, of which there were 23.

Using information from Securities Data Corp. and FactSet Research Systems, Inc., premiums paid were calculated as the percentage by which the per share consideration paid in each such transaction exceeded the closing price per share of the target companies one day, one week and four weeks prior to transaction announcements. The results of this analysis are provided in the table below:

| | 1 Day Prior | 1 Week Prior | 4 Weeks Prior |
|---|---|---|---|
| **Global Transactions** | | | |
| High | 116.4% | 123.6% | 118.7% |
| 75th Percentile | 37.1% | 39.9% | 40.6% |
| 25th Percentile | 13.0% | 15.7% | 18.4% |
| Low | 0.1% | 1.0% | 1.9% |
| Mean | 27.7% | 30.3% | 32.2% |
| Median | 24.5% | 27.2% | 28.0% |
| | | | |
| **Cash Transactions** | | | |
| High | 116.4% | 123.6% | 118.7% |
| 75th Percentile | 43.3% | 51.1% | 51.8% |
| 25th Percentile | 18.9% | 18.9% | 21.9% |
| Low | 0.4% | 1.0% | 5.7% |
| Mean | 33.8% | 36.3% | 38.8% |
| Median | 28.0% | 30.0% | 32.8% |
| | | | |
| **Strategic Transactions** | | | |
| High | 116.4% | 123.6% | 118.7% |
| 75th Percentile | 38.0% | 41.5% | 43.0% |
| 25th Percentile | 14.1% | 16.5% | 17.9% |
| Low | 0.1% | 1.0% | 3.3% |
| Mean | 28.9% | 31.7% | 33.7% |
| Median | 27.9% | 28.4% | 30.8% |
| | | | |
| **Sponsor Transactions** | | | |
| High | 45.1% | 50.8% | 47.2% |
| 75th Percentile | 31.2% | 31.8% | 33.1% |
| 25th Percentile | 10.5% | 14.3% | 19.6% |
| Low | 4.4% | 2.8% | 1.9% |
| Mean | 22.1% | 24.3% | 25.6% |
| Median | 20.1% | 22.8% | 26.0% |

Based on the above analysis and Evercore's professional judgment and experience, Evercore then applied a range of premiums derived from the selected transactions of: (1) 22.5% to 27.5% to the $10.97 closing price per share of the Company and the $7.63 enterprise value per share of the Common Stock (taking

into account estimated net cash of the Company as of January 31, 2013 as provided by Company management), in each case, on January 4, 2013 (the date one week prior to the last trading day before media reports of a possible going private transaction involving the Company were first published) and (2) 25.0% to 30.0% to the $10.67 closing price per share and the $7.33 enterprise value per share of the Common Stock (taking into account estimated net cash of the Company as of January 31, 2013 as provided by Company management), in each case, on December 11, 2012 (the date four weeks prior to the last trading day before media reports of a possible going private transaction involving the Company were first published). Based on this analysis, Evercore derived the following range of implied equity values per share for the Company:

| | | Implied Equity Value Per Share |
|---|---|---|
| **1 Week Prior to January 11, 2013** | | |
| Closing Price ($10.97) | $ | 13.44 - $13.99 |
| Enterprise Value ($7.63) | $ | 12.69 - $13.07 |
| **4 Weeks Prior to January 11, 2013** | | |
| Closing Price ($10.67) | $ | 13.34 - $13.87 |
| Enterprise value ($7.33) | $ | 12.50 - $12.87 |

Evercore compared the results of this analysis to the $13.65 per share merger consideration to be received by the holders of Company common stock entitled to receive such consideration pursuant to the merger agreement, noting that the merger consideration is above the two implied valuation ranges that were derived from the enterprise value per share of the Common Stock and within the two other implied valuation ranges that were derived from the closing price per share of the Common Stock.

115.    **Evercore's Leveraged Buyout Analysis**.    The description of Evercore's Leveraged Buyout Analysis on page 78 of the Proxy and other information disclosed about this analysis in the Transaction Statement are materially deficient because they omit the basis of Evercore's assumption of a target internal rate of return of 20%-30% in the analysis.

116.    The omission of this information renders the following statements in the Proxy materially misleading:

(a)    on page 69, the statement:

Pursuant to an engagement letter dated January 10, 2013, the Special Committee retained Evercore to act as financial advisor to the Special Committee. On February 4, 2013, at meetings of the Special Committee and the Board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion later that day, that, as of February 4, 2013, and based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in its opinion, the $13.65 per share merger consideration was fair, from a financial point of view, to the holders of the shares of Common Stock entitled to receive such merger consideration.

(b)      on page 78, the statement:

Evercore performed a leveraged buyout analysis of the Company to estimate the price per share that a potential financial buyer might be willing to pay based upon each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case. For purposes of this analysis, Evercore assumed the financial buyer would complete the transaction on July 31, 2013, a target internal rate of return ranging from 20.0% to 30.0%, an exit by the financial buyer on January 31, 2018, new debt of $11.4 billion, a $2.0 billion investment by Microsoft, an equity contribution by the financial buyer of $1.5 billion and the use of cash on hand of $8.2 billion. To estimate the value of the Company at exit on January 31, 2018, Evercore applied an EV/EBITDA multiple range of 3.0x to 5.0x (which was based on the multiple range used in the Trading Multiples Analysis described above) to estimate EBITDA for fiscal year 2018 and adjusted the resulting enterprise value by estimated net debt of the Company as of January 31, 2018. Using this analysis, Evercore derived the following range of implied equity values per share for the Company:

|  | Implied Equity Value Per Share | |
|---|---|---|
| September 21 Case | $ | 12.83 - $16.87 |
| BCG Base Case | $ | 10.75 - $12.82 |
| BCG Productivity Case | $ | 11.45 - $16.86 |
| Street Median Case | $ | 10.87 - $13.08 |

Evercore compared the results of this analysis to the $13.65 per share merger consideration to be received by the holders of Common Stock entitled to receive such consideration pursuant to the merger agreement, noting that the merger consideration was above two of the implied valuation ranges and within the other two implied valuation ranges.

117.   **Evercore's Discounted Cash Flow Analysis**.   The description of Evercore's Discounted Cash Flow Analysis on pages 78-79 of the Proxy and other information disclosed about this analysis in the Transaction Statement are materially deficient because they omit:

(a)      the specific inputs and assumptions (including but not limited to the risk-free rate, the beta range, the equity risk premium, any other premiums used, the Company's pre-tax cost of debt and tax rate, and the assumed capital structure) used to derive the range of discount rates (10%-12%) used in the analysis.  This information is particularly material because Evercore used a lower discount rate range of 8%-10% in its earlier presentations to the Board and Special Committee and then raised its discount range to 10%-12% for its final presentation,

which drove down the resulting value range for the Company, without disclosing any basis for this change;

(b)     how stock-based compensation was treated in the analysis (i.e., as a cash or non-cash expense); and

(c)     why this analysis was performed only for reference and information purposes, and not for valuation purposes.

118.     The omission of this information renders the following statements in the Proxy materially misleading:

(a)     on page 69, the statement:

Pursuant to an engagement letter dated January 10, 2013, the Special Committee retained Evercore to act as financial advisor to the Special Committee. On February 4, 2013, at meetings of the Special Committee and the Board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion later that day, that, as of February 4, 2013, and based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in its opinion, the $13.65 per share merger consideration was fair, from a financial point of view, to the holders of the shares of Common Stock entitled to receive such merger consideration.

(b)     on pages 78-79, the statement:

Evercore performed, for reference and informational purposes only, a discounted cash flow analysis of the Company, which calculates the present value of a company's future unlevered, after-tax free cash flow based on assumptions with respect to such cash flow and assumed discount rates, in order to derive implied equity per share reference ranges for the Common Stock as of January 31, 2013 based upon each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case. Evercore calculated the projected after-tax unlevered free cash flows of the Company for fiscal years 2014 through 2017 and determined a terminal value for the Company at the end of fiscal year 2017 by applying a range of EBITDA multiples of 3.0x to 5.0x(which was based on the multiple range used in the Trading Multiples Analysis described above). Evercore then discounted to present value (utilizing a midyear discounting convention and discounting back to January 31, 2013) the unlevered free cash flows of the Company and the terminal value, in each case using discount rates ranging from 10.0% to 12.0% (which range was based on Evercore's professional judgment and experience, taking into account the Company's cost of equity derived using the capital asset pricing model and the yield on the Company's outstanding traded debt securities). Using this analysis, Evercore derived the following range of implied equity values per share for the Company:

| | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $ 15.92 - $21.31 |
| BCG Base Case | $ 11.19 - $14.42 |
| BCG Productivity Case | $ 12.82 - $21.53 |
| Street Median Case | $ 11.49 - $14.95 |

Evercore compared the results of this analysis to the $13.65 per share merger consideration to be received by the holders of Company common stock entitled to receive such consideration pursuant to the merger agreement, noting that the merger consideration was below one implied valuation range and within all of the other implied valuation ranges.

In addition, Evercore performed a discounted cash flow analysis utilizing the same methodology described above for the Street Median Case for the lowest and highest projections from the list of Wall Street research analysts used in the Street Median Case described above. The lowest projections were the projections provided by Citigroup Inc. as of November 16, 2012 (the "Street Low Case") and the highest projections were the projections provided by Bank of America Corporation as of November 15, 2012 (the "Street High Case"). Using this analysis, Evercore derived the following range of implied equity values per share for the Company:

| | Implied Equity Value Per Share |
|---|---|
| Street Low Case | $ 10.63 - $13.87 |
| Street High Case | $ 12.99 - $17.12 |

Evercore compared the results of this analysis to the $13.65 per share merger consideration to be received by the holders of Company common stock entitled to receive such consideration pursuant to the merger agreement, noting that the merger consideration is within each of the implied valuation ranges.

119.    These statements, identified in ¶¶100-118 above, are rendered materially misleading by the omissions because they paint an incomplete picture of how J.P. Morgan and Evercore selected and used the key inputs and assumptions in their financial analyses, which, without full disclosure of such information, calls into question their ultimate conclusions that the Proposed Acquisition is fair.

**Financial Projections**

120.    According to page 65 of the Proxy, J.P. Morgan relied upon certain financial forecasts for the Company, including the Preliminary FY14 Internal Plan, the Preliminary FY14 Board Case, the BCG Base Case (a baseline forecast prepared by consultant BCG), BCG 25% Case (which assumed that the Company achieved 25% of management's cost reduction goals),

and BCG 75% Case (which assumed that the Company met 75% of its goals).  Similarly, according to page 66 of the Proxy, Evercore relied upon financial forecasts for the Company in performing its financial analyses, including the BCG Base Case, the BCG 25% Case, the BCG 75% Case, the September 21 Case, and the Street Median Case (which according to the Proxy, reflected median projections of ten Wall Street research analysts through Fiscal Year 2015).  The Proxy and the Transaction Statement, however, do not disclose the following:

        (a)     whether the Board considered which set of projections was the most and least reliable, and if so, the Board's conclusions on these matters;

        (b)     the ten analysts whose projections were used to create the Street Median Case and the basis for selecting these particular analysts' projections;

        (c)     whether any projections were prepared for the M. Dell Restructuring Plan, and if so, the forecasted financial data and any resulting valuations.  If no such projections were created, the reasons why the Company did not do so;

        (d)     the definition of operating cash flows for purposes of the Company's financial projections that were used in the financial analyses; and

        (e)     the following financial data for each set of projections, including the BCG Base Case (for Fiscal Years 2013-2017), the BCG 25% Case (same), BCG 75% Case (same), Street Median Case (for Fiscal Years 2013-2015):

                (i)     operating cash flow, tax free cash flow, or any other projected cash flows;

                (ii)     changes in net working capital;

                (iii)     taxes or tax rate;

                (iv)     depreciation and amortization; and

(v)      stock-based compensation expenses.

121.    The omission of this information renders the following statements in the Proxy materially misleading:

(a)      on page 62, the statement:

At the meeting of the Board on February 4, 2013, J.P. Morgan rendered its oral opinion to the Board and the Special Committee that, as of such date and based upon and subject to the factors and assumptions set forth in such opinion, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. J.P. Morgan confirmed its February 4, 2013 oral opinion by delivering its written opinion to the Board and the Special Committee, dated as of the same date, that, as of such date, the consideration to be paid to the holders of Common Stock (other than shares of Common Stock held in treasury or owned by Merger Sub and its subsidiaries, other excluded shares, Company restricted shares and dissenting shares) in the proposed merger was fair, from a financial point of view, to such holders. No limitations were imposed by the Board or the Special Committee upon J.P. Morgan with respect to the investigations made or procedures followed by it in rendering its opinion.

(b)      on pages 66-67, the statement:

J.P. Morgan then calculated the Company's equity value per share implied by certain reference ranges of multiples, which were selected by J.P. Morgan based on the multiples calculated for comparable companies, under various projections of EBITDA and earnings per share for the Company for the Company's fiscal year 2014. In calculating the implied equity value per share for the Company, J.P. Morgan reviewed five different cases, two of which, the Preliminary FY14 Internal Plan and the Preliminary FY14 Board Case (each as defined below), were prepared by the Company's management and three of which, the BCG Base Case, the BCG 25% Case and the BCG 75% Case (each as defined below), were prepared by BCG. Each of these cases is discussed in more detail under "—Background of the Merger" beginning on page 19 and "—Projected Financial Information" beginning on page 86.

A summary of the implied valuation ranges of the Common Stock that J.P. Morgan derived based on the ratio of Enterprise Value to estimated EBITDA under each of the five cases, using a reference range of 3.5x to 5.5x, is set forth below:

| Case | Implied Valuation Range |
|------|------------------------|
| Preliminary FY14 Internal Plan | $ 12.00 to $17.25 |
| Preliminary FY14 Board Case | $ 11.25 to $16.00 |
| BCG Base Case | $ 10.50 to $15.00 |
| BCG 25% Case | $ 12.00 to $17.25 |
| BCG 75% Case(1) | $ 15.25 to $22.50 |

(1) Calculated for informational purposes only.

- 70 -

A summary of the implied valuation ranges of the Common Stock that J.P. Morgan derived based on the ratio of price per share to expected earnings per share under each of the five cases, using a reference range of 5.0x to 10.0x, is set forth below:

| Case | Implied Valuation Range |
|---|---|
| Preliminary FY14 Internal Plan | $   8.75 to $17.50 |
| Preliminary FY14 Board Case | $   8.00 to $16.00 |
| BCG Base Case | $   7.25 to $14.50 |
| BCG 25% Case | $   9.00 to $18.00 |
| BCG 75% Case(1) | $  13.00 to $26.00 |

(1) Calculated for informational purposes only.

All values presented were rounded to the nearest $0.25. In each case, J.P. Morgan compared the implied equity values per share to (i) the merger consideration of $13.65 per share in cash to be paid to holders of the Common Stock in the merger, noting that the merger consideration is within each of the implied valuation ranges other than the one based on the ratio of Enterprise Value to estimated EBITDA in the BCG 75% Case (which range was calculated for informational purposes only), (ii) the $10.88 per share closing price of the Common Stock as of January 11, 2013, the last trading day before media reports of a possible going private transaction involving the Company were first published, (iii) the $13.63 per share closing price of the Common Stock as of February 1, 2013 and (iv) the $9.64 per share closing price of the Common Stock as of November 30, 2012, the last trading day before an analyst report was issued by Goldman Sachs suggesting that the Company might be a target for a leverage buyout transaction.

(c)      on page 67, the statement:

J.P. Morgan calculated the unlevered free cash flows that the Company is expected to generate (i) during the time period from November 2012 through January 2016 on the basis of the BCG Base Case, the BCG 25% Case and the BCG 75% Case, and (ii) during the time period from November 2012 through January 2017 on the basis of the September 21 Case prepared by the management of the Company. J.P. Morgan calculated the unlevered free cash flows based upon the BCG 75% Case and the September 21 Case for informational purposes only. Each of these cases is discussed in more detail under " —*Background of the Merger*" beginning on page 19 and "—*Projected Financial Information*" beginning on page 86.

J.P. Morgan also calculated a range of terminal asset values of the Company by applying an EV/EBITDA multiple ranging from 3.5x to 5.5x of the EBITDA of the Company as estimated for the terminal period. The unlevered free cash flows and the range of terminal asset values were then discounted to present values using a range of discount rates from 9.5% to 13.5%, which were chosen by J.P. Morgan based upon an analysis of the weighted average cost of capital of the Company and the selected companies identified above.

\*        \*        \*

The present value of the unlevered free cash flows and the range of terminal asset values were then adjusted for the Company's estimated debt, cash and cash

equivalents as of November 2, 2012 (as provided by the Company's management).

A summary of the implied valuation ranges of the Common Stock that J.P. Morgan derived from such analyses is set forth below. As noted above, J.P. Morgan's analysis took into account its discussions with the Special Committee, management and BCG, including the factors and circumstances discussed with the Special Committee surrounding the forecasts and analyses prepared by BCG and management. Taking into account the actual performance of the Company, the condition of the markets in which it is active and such discussions, the ranges with respect to the September 21 Case and the BCG 75% Case were calculated for informational purposes only, and J.P. Morgan gave no weight to the September 21 Case and the BCG 75% Case in its discounted cash flow analysis.

| Case | Implied Valuation Range |
|------|------------------------|
| BCG Base Case | $ 10.50 to $14.25 |
| BCG 25% Case | $ 12.00 to $16.50 |
| BCG 75% Case(1) | $ 15.00 to $21.25 |
| September 21 Case(1) | $ 15.50 to $21.75 |

(1) Calculated for informational purposes only.

      (d)      on page 69, the statement:

Pursuant to an engagement letter dated January 10, 2013, the Special Committee retained Evercore to act as financial advisor to the Special Committee. On February 4, 2013, at meetings of the Special Committee and the Board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion later that day, that, as of February 4, 2013, and based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in its opinion, the $13.65 per share merger consideration was fair, from a financial point of view, to the holders of the shares of Common Stock entitled to receive such merger consideration.

      (e)      on page 72, the statement:

In conducting its analysis, Evercore utilized four sets of financial projections including (1) the September 21 Case, (2) the BCG Base Case, (3) the incremental effect of the Cost Savings on the BCG Base Case, as reflected in the range from the BCG 25% Case to the BCG 75% Case (such range, the "BCG Productivity Case") and (4) a street median case which reflects median projections of ten Wall Street research analysts through fiscal year 2015 ("FY2015") and which were extrapolated to fiscal year 2018 by applying constant revenue growth and margins (the "Street Median Case"). The Street Median Case projections were as follows:

| Street Median Case | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in billions, except per share data) | | | | | | | | | | | |
| | FY2013 | | FY2014 | | FY2015 | | FY2016 | | FY2017 | | FY2018 |
| Revenue | $ | 56.7 | $ | 55.2 | $ | 54.8 | $ | 54.5 | $ | 54.2 | $ | 53.8 |
| EBITDA | $ | 4.5 | $ | 4.1 | $ | 3.9 | $ | 3.9 | $ | 3.8 | $ | 3.8 |
| EBITA | $ | 3.9 | $ | 3.6 | $ | 3.5 | $ | 3.5 | $ | 3.5 | $ | 3.4 |
| Net Income(1) | $ | 3.0 | $ | 2.7 | $ | 2.6 | $ | 2.6 | $ | 2.6 | $ | 2.6 |
| EPS | $ | 1.70 | $ | 1.60 | $ | 1.60 | | N.A. | | N.A. | | N.A. |
| Free Cash Flow(1)(2) | $ | 1.6 | $ | 2.0 | $ | 1.8 | $ | 1.9 | $ | 2.2 | $ | 2.2 |

      (f)      on pages 73-75, the statement:

For purposes of its analysis, Evercore calculated (i) the historical forward EV/EBITDA, MEV/NI and MEV/FCF multiples of the Company for the five years prior to January 11, 2013, utilizing the closing price per share of the Common Stock on each historical day and research estimates as of that date for the projected EBITDA, net income and free cash flow for the next twelve months, (ii) the historical forward EV/EBITDA, MEV/NI and MEV/FCF multiples of Hewlett Packard ("HP") (which Evercore deemed, based on its professional judgment and experience, the only company sufficiently comparable to the Company for purposes of this analysis) for the five years prior to January 11, 2013, utilizing the closing price per share of HP's common stock on each historical day and research estimates as of that date for the projected EBITDA, net income and free cash flow for the next twelve months, (iii) the current forward EV/EBITDA, MEV/NI and MEV/FCF multiples of the Company utilizing the closing price per share of the Common Stock on January 11, 2013 and estimates for EBITDA, net income and free cash flow under each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case, (iv) the current forward EV/EBITDA, MEV/NI and MEV/FCF multiples of HP utilizing the closing price per share of HP's common stock on February 1, 2013 and publicly available research estimates for calendar year 2013 ("CY2013") EBITDA, CY2013 net income and CY2013 free cash flow of HP, and (v) the current forward EV/EBITDA, MEV/NI and MEV/FCF multiples of the Company's peer trading group, which group was divided into the Company's (1) personal computer peers including Acer, ASUSTeK Computer, Lenovo, Toshiba, Apple, Samsung and Fujitsu (such peer group collectively, "PC Heavy"), (2) enterprise focused peers including IBM, Oracle, EMC, NetApp, Cisco Systems and CSC (such peer group collectively, "Enterprise Heavy") and (3) other peers including Ricoh, Xerox, Seiko Epson, Canon, Tech Data Corp and Lexmark (such peer group collectively, "Other") utilizing the closing price per share of each comparable company's common stock on February 1, 2013 and publicly available research estimates for CY2013 EBITDA, CY2013 net income and CY2013 free cash flow of each comparable company. The analyses resulted in the following multiples:

| Trading Multiples | EV/EBITDA | MEV/NI | MEV/FCF |
|---|---|---|---|
| **Company:** | | | |
| Current: | | | |
| September 21 Case | 2.8x | 6.0x | 6.0x |
| BCG Base Case | 3.4x | 7.6x | 8.2x |
| BCG Productivity Case | 3.3x | 7.4x | 8.0x |
| Street Median Case | 3.2x | 7.0x | 9.3x |
| 5-Year High | 9.4x | 14.9x | 13.6x |
| 5-Year Low | 2.0x | 5.5x | 4.9x |
| 5-Year Average | 4.4x | 9.9x | 8.1x |
| **HP:** | | | |
| Current | 3.7x | 4.9x | 6.8x |
| 5-Year High | 9.4x | 13.7x | 13.2x |
| 5-Year Low | 2.9x | 3.8x | 4.9x |
| 5-Year Average | 5.6x | 8.7x | 8.6x |
| **Current Peer Trading Group Multiples** | | | |
| **PC Heavy Peers:** | | | |
| High | 8.1x | 23.9x | 18.2x |
| Low | 3.3x | 8.4x | 9.1x |
| Median | 5.4x | 11.6x | 11.0x |
| **Enterprise Heavy Peers:** | | | |
| High | 8.7x | 16.7x | 13.7x |
| Low | 4.1x | 10.3x | 8.0x |
| Median | 7.1x | 13.3x | 11.1x |
| **Other:** | | | |
| High | 7.2x | 14.0x | 19.9x |
| Low | 2.2x | 6.3x | 5.7x |
| Median | 4.9x | 8.9x | 12.9x |

Based on the results of this analysis and Evercore's professional judgment and experience, Evercore selected (1) an EV/EBITDA multiple reference range of 3.0x to 5.0x, (2) a MEV/NI multiple reference range of 6.0x to 10.0x and (3) a MEV/FCF multiple reference range of 6.0x to 10.0x. Evercore then applied such reference ranges to the Company's estimated fiscal year 2014 EBITDA, net income and free cash flow, respectively, for each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case. Based on this analysis, Evercore derived the following range of implied equity values per share for the Company.

| Estimated FY2014 EBITDA | Implied Equity Value Range Per Share |
|---|---|
| September 21 Case | $11.52—$16.99 |
| BCG Base Case | $10.09—$14.62 |
| BCG Productivity Case | $10.24—$15.34 |
| Street Median Case | $10.42—$15.16 |

| Estimated FY2014 Net Income | Implied Equity Value Range Per Share |
|---|---|
| September 21 Case | $10.87—$18.08 |
| BCG Base Case | $8.61—$14.35 |
| BCG Productivity Case | $8.84—$15.48 |
| Street Median Case | $9.34—$15.55 |

| Estimated FY2014 Free Cash Flow | Implied Equity Value Range Per Share |
|---|---|
| September 21 Case | $10.92—$18.16 |
| BCG Base Case | $7.99—$13.31 |
| BCG Productivity Case | $8.20—$14.35 |
| Street Median Case | $7.01—$11.68 |

(g)     on page 75, the statement:

Present Value of Future Stock Price Analysis

Evercore calculated illustrative future stock prices for the Company's common stock on January 31, 2015 by applying (i) a range of forward EV/EBITDA multiples of 3.0x to 5.0x to estimated EBITDA of the Company for fiscal year 2016 ("FY2016") and adjusted the resulting enterprise value by estimated net debt of the Company as of January 31, 2015 , (ii) a range of forward MEV/NI multiples of 6.0x to 10.0x to estimated net income of the Company for FY2016 and (iii) a range of forward MEV/FCF multiples of 6.0x to 10.0x to estimated free cash flow of the Company for FY2016. The forward EV/EBITDA, MEV/NI multiples and MEV/FCF multiples were based on the multiple ranges used in the Trading Multiples Analysis described above. Evercore then applied such reference ranges to the Company's estimated FY2016 EBITDA, net income and free cash flow, respectively, for each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case.

The illustrative future market equity values for the Company on January 31, 2015, were then discounted back to January 31, 2013, using an equity discount range of 12.0% to 13.0% (which was based on Evercore's professional judgment and experience, taking into account the Company's cost of equity derived using the capital asset pricing model) and divided by the estimated diluted share count as of January 31, 2013 as provided by Company management. Based on this analysis, Evercore derived the following range of implied equity values per share for the Company:

| Estimated FY2016 Net Income | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $14.05—$21.60 |
| BCG Base Case | $9.11—$13.59 |
| BCG Productivity Case | $11.06—$23.11 |
| Street Median Case | $10.08—$15.04 |

| Estimated FY2016 FCF | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $14.31—$22.04 |
| BCG Base Case | $9.04—$13.48 |
| BCG Productivity Case | $10.92—$22.63 |
| Street Median Case | $8.20—$11.86 |

| Estimated FY2016 EBITDA | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $13.08—$18.64 |
| BCG Base Case | $9.54—$13.15 |
| BCG Productivity Case | $10.83—$19.37 |
| Street Median Case | $10.84—$14.56 |

(h)     on page 76, the statement:

Share Buyback Analysis

Evercore calculated illustrative future stock prices of the Company on January 31, 2015, assuming that the Company repurchased $5.0 billion of shares of Company common stock at a 15% premium to the $10.88 closing price per share of the Company's common stock on January 11, 2013. As part of this analysis, Evercore applied (1) a range of forward EV/EBITDA multiples of 3.0x to 5.0x to estimated EBITDA of the Company for FY2016 and adjusted the resulting enterprise value by estimated net debt of the Company as of January 31, 2015 and (2) a range of forward MEV/NI multiples of 6.0x to 10.0x to estimated net income of the Company for FY2016. The EV/EBITDA multiples and MEV/NI multiples were based on the multiple ranges used in the Trading Multiples Analysis described above. Evercore then applied such reference ranges to the Company's estimated FY2016 EBITDA and net income, respectively, for each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case.

The illustrative future market equity values for the Company on January 31, 2015, were then discounted back to January 31, 2013, using an equity discount range of 12.0% to 13.0% (based on the discount range used in the described Present Value of Future Stock Price Analysis above) and divided by the estimated diluted share count of the Company as of January 31, 2013 as provided by Company management. Based on this analysis, Evercore derived the following range of implied equity values per share for the Company:

| Estimated FY2016 EBITDA | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $13.55—$19.05 |
| BCG Base Case | $10.01—$13.58 |
| BCG Productivity Case | $11.30—$19.77 |
| Street Median Case | $11.31—$14.99 |

| Estimated FY2016 Net Income | Implied Per Share Equity Value |
|---|---|
| September 21 Case | $14.43—$21.84 |
| BCG Base Case | $9.48—$13.85 |
| BCG Productivity Case | $11.43—$23.33 |
| Street Median Case | $10.45—$15.31 |

(i)      on page 78, the statement:

Leveraged Buyout Analysis

Evercore performed a leveraged buyout analysis of the Company to estimate the price per share that a potential financial buyer might be willing to pay based upon each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case. For purposes of this analysis, Evercore assumed the financial buyer would complete the transaction on July 31, 2013, a target internal rate of return ranging from 20.0% to 30.0%, an exit by the financial buyer on January 31, 2018, new debt of $11.4 billion, a $2.0 billion investment by Microsoft, an equity contribution by the financial buyer of $1.5 billion and the use of cash on hand of $8.2 billion. To estimate the value of the Company at exit on January 31, 2018, Evercore applied an EV/EBITDA multiple range of 3.0x to 5.0x (which was based on the multiple range used in the Trading Multiples Analysis described above) to estimate EBITDA for fiscal year 2018 and adjusted the resulting enterprise value by estimated net debt of the Company as of January 31, 2018. Using this analysis, Evercore derived the following range of implied equity values per share for the Company:

| | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $ 12.83 - $16.87 |
| BCG Base Case | $ 10.75 - $12.82 |
| BCG Productivity Case | $ 11.45 - $16.86 |
| Street Median Case | $ 10.87 - $13.08 |

(j)      on pages 78-79, the statement:

Discounted Cash Flow Analysis

Evercore performed, for reference and informational purposes only, a discounted cash flow analysis of the Company, which calculates the present value of a company's future unlevered, after-tax free cash flow based on assumptions with respect to such cash flow and assumed discount rates, in order to derive implied equity per share reference ranges for the Common Stock as of January 31, 2013 based upon each of the September 21 Case, the BCG Base Case, the BCG Productivity Case and the Street Median Case. Evercore calculated the projected after-tax unlevered free cash flows of the Company for fiscal years 2014 through 2017 and determined a terminal value for the Company at the end of fiscal year 2017 by applying a range of EBITDA multiples of 3.0x to 5.0x (which was based

on the multiple range used in the Trading Multiples Analysis described above). Evercore then discounted to present value (utilizing a midyear discounting convention and discounting back to January 31, 2013) the unlevered free cash flows of the Company and the terminal value, in each case using discount rates ranging from 10.0% to 12.0% (which range was based on Evercore's professional judgment and experience, taking into account the Company's cost of equity derived using the capital asset pricing model and the yield on the Company's outstanding traded debt securities). Using this analysis, Evercore derived the following range of implied equity values per share for the Company:

|  | Implied Equity Value Per Share |
|---|---|
| September 21 Case | $ 15.92 - $21.31 |
| BCG Base Case | $ 11.19 - $14.42 |
| BCG Productivity Case | $ 12.82 - $21.53 |
| Street Median Case | $ 11.49 - $14.95 |

122.    The omissions in the Company's financial projections render the above statements materially misleading because without full access to the estimates of Dell's future cash flows, Dell shareholders cannot reliably compare the intrinsic value of the Company to the consideration offered by the Proposed Acquisition, and thus cannot determine whether the Proposed Acquisition is indeed fair, as defendants and their financial advisors claim.

## CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action for themselves and on behalf of all holders of Dell's common stock which have been or will be harmed by the conduct described herein (the "Class"). Excluded from the Class are the defendants and any individual or entity affiliated with any defendant.

124.    This action is properly maintainable as a class action.

125.    The Class is so numerous that joinder of all members is impracticable.  According to Dell's SEC filings, there were more than 1.7 billion shares of common stock outstanding as of March 6, 2013.

126.    There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include the following:

(a)     whether the Proposed Acquisition is the result of an entirely fair process and at an entirely fair price to the Company's shareholders;

(b)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(c)     whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(d)     whether the Individual Defendants have breached any of their other fiduciary duties owed to plaintiffs and the other members of the Class in connection with the Proposed Acquisition, including the duties of loyalty, diligence, and fair dealing;

(e)     whether the Individual Defendants have fully and fairly disclosed all material information necessary for the public shareholders to cast an informed vote on the Proposed Acquisition;

(f)     whether Dell aided and abetted the Individual Defendants' breaches of fiduciary duties; and

(g)     whether plaintiffs and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

127.    Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

128.    Plaintiffs have retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

129.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

130.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

131.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Against the Individual Defendants and Dell for Violations of
### Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

132.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.    The Individual Defendants and Dell disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants and Dell.   It misrepresented and/or omitted material facts, including material information about the actual intrinsic value of the Company.

135.    In so doing, the Individual Defendants and Dell made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

136.    The Individual Defendants and Dell were at least negligent in filing the Proxy with these materially false and misleading statements.

137.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

138.    By reason of the foregoing, the Individual Defendants and Dell have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

139.    Because of the false and misleading statements in the Proxy, plaintiffs are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a)
### of the Exchange Act

140.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141.    The Individual Defendants acted as controlling persons of Dell within the meaning of section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of Dell, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

- 81 -

142.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

143.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were, thus, directly involved in the making of the Proxy.

144.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the directors.  By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

145.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.

## COUNT III

### Breach of Fiduciary Duties Against the Individual Defendants

146.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

147.    The Individual Defendants have violated the fiduciary duties of care, loyalty, and independence owed to the public shareholders of Dell have acted to put their personal interests ahead of the interests of Dell's shareholders.

148.    By the acts, transactions, and course of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiffs and other members of the Class of the true value inherent in and arising from Dell.

149.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and independence owed to the shareholders of Dell because, among other reasons:

(a)     they failed to take steps to maximize the value of Dell to its public shareholders;

(b)     they failed to properly value Dell and its various assets and operations; and

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Proposed Acquisition.

150.    Because the Individual Defendants dominate and control the business and corporate affairs of Dell, and are in possession of or have access to private corporate information concerning Dell assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Dell which makes it inherently unfair for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

151.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary

obligations toward plaintiffs and the other members of the Class.

152.   The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiffs and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

153.   As a result of the Individual Defendants' unlawful actions, plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Dell's assets and operations.  Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiffs and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

154.   Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT IV

**Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty
Against Dell, Silver Lake, Denali Holding, and Merger Sub**

155.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

156.   Defendants Dell, Silver Lake, Denali Holding, and Merger Sub are sued herein as aiders and abettors of the breaches of fiduciary duty outlined above by the Individual Defendants.

157.   The Individual Defendants breached their fiduciary duties of loyalty, care, candor, and good faith and fair dealing to the Dell shareholders.

158.     Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants Dell, Silver Lake, Denali Holding, and Merger Sub in aiding and abetting such breaches.

159.     Defendants Dell, Silver Lake, Denali Holding, and Merger Sub had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Dell shareholders, and thus knowingly participated in such breaches.

160.     Defendants Dell, Silver Lake, Denali Holding, and Merger Sub provided substantial assistance to the Individual Defendants in the breach of their fiduciary duties owed to Dell shareholders.

161.     As a result of defendants Dell, Silver Lake, Denali Holding, and Merger Sub's aiding and abetting the Individual Defendants' breaches of fiduciary duties, plaintiffs and the other members of the Class were damaged in that they were prevented from obtaining a fair price for their shares.

162.     Plaintiffs and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand injunctive relief, in their favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for shareholders;

C.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a

transaction that is in the best interests of Dell's shareholders and to refrain from entering into any

transaction until the process for the sale or merger of the Company is completed and the highest

possible value is obtained;

D.      Awarding plaintiffs the costs and disbursements of this action, including

reasonable attorneys' and experts' fees; and

E.      Granting such other and further equitable relief as this Court may deem just and

proper.

Dated: May 30th, 2013

THE WARNER LAW FIRM
PAUL T. WARNER

_____
PAUL T. WARNER

SBN: 00791884
SDTXBN: 25143
11123 McCracken Circle, Suite A
Cypress, TX 77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774
E-mail: pwarner@warner-law.net

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
EDWARD B. GERARD
JUSTIN D. RIEGER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:  brobbins@robbinsarroyo.com
             soddo@robbinsarroyo.com
             egerard@robbinsarroyo.com
             jrieger@robbinsarroyo.com

RYAN & MANISKAS, LLP
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA 19087

- 86 -

Telephone: (484) 588-5516
Facsimile: (484) 450-2582
E-mail:  rmaniskas@rmclasslaw.com

ROBEIN, URANN, SPENCER, PICARD
   & CANGEMI APLC
MARIA CANGEMI
CHRISTINA CARROLL
2540 Severn Avenue, Suite 400
Metairie, LA  70002
Telephone:  (504) 885-9994
Facsimile:  (504) 885-9969
E-mail:  mcangemi@ruspclaw.com
             ccarroll@ruspclaw.com

Attorneys for Plaintiffs